CHRISTIAN, J.
These two cases are *278 brought up by writs of error to judgments of the Circuit court of the city of Richmond. Being kindred cases, they were heard together in this court, and were argued with marked ability and learning by the counsel on both sides. They present a question, which is without judicial precedent in this State. Its adjudication, here, will affect important interests. Its novelty, as well as its importance, alike demands a very careful consideration.
In the one case, the suit is brought by the Exchange Bank, for the use of Geo. W. Camp, trustee, to . recover a certain sum of the defendants, who were makers and endorsers of a nejgotiable note, duly protested, and which was the property of said bank, before and at the time of the assignment of its assets to trustees for the benefit of its creditors. In the other case, the suit is instituted by the Farmers Bank for the use of Goddin and Robinson, trustees, tp recover of the defendants a certain amount, loaned and advanced to them; which ^amount they have overdrawn in their dealings with the bank.
In the first case, the defendants pleaded “nil debet,” and also filed a plea of “tender and offsets.”
In the second case, the defendants plead “non assumpsit,” “payment,” and “set off.”
In both cases, the defendants filed an account of offsets, consisting of the notes of these banks, respectively, representing nominally the full amount of plaintiffs’ demand. It is admitted in both cases, that these bank notes were acquired by the defendants after the respective deeds of assignment were made, and that they were greatly depreciated below their face value. It is also admitted, that when these bills of the bank were purchased, the defendants had notice of the said assignment.
The sole question, therefore, presented in these two records is, whether or not, these depreciated bank notes thus acquired, can be set off against the demands of the plaintiffs, suing for the -use of the trustees of the creditors of the banks. It is to this question that I shall confine my opinion.
The close of the late civil war found all the banks of circulation in the State, in a condition of hopeless insolvency. They were compelled to suspend business, and there was scarcely a remote possibility of a resumption. In this state of things, forced upon them bjr the calamities of war, nothing remained for them but to go at once into a course of liquidation, and to distribute among their creditors such remnants of their assets as might yet be realized.
In this condition of things, and to effectuate this object upon equitable terms, the general assembly passed the act of the 12th of February 1866, entitled an act requiring the banks of the Commonwealth to go into liquidation.
The purpose of that act was to provide regulations, *by which, as recited in the preamble, “a speedy settlement of the affairs of said banks should be made, in order to a legal and proper distribution of their assets amongst all persons entitled to share in such distribution. ”
The 1st section provides that it shall be lawful for the president and directors of any bank of circulation, chartered by the general assembly of Virginia, to make a deed, conveying all the assets of the bank to such persons as they may select; and providing that “the proceeds of said assets shall be distributed amongst all persons, corporations and associations entitled to share in such distribution, according to the legal rights and priorities of such persons, corporations and associations, at the time such deed shall be executed.”
In conformity with this act of assembly, and in strict pursuance of its provisions, the Exchange Bank and the Farmers Bank each executed, in proper legal form, through its president and directors a deed, by which all the assets, real and personal, of said banks, respectively, were conveyed to certain trustees therein named, for the benefit of the creditors of said banks.
The deed made by the Exchange Bank provides for a distribution of its assets “pro rata” amongst all its creditors, according to their legal rights and priorities. The deed executed by the Farmers Bank gives preference to the noteholders over the depositors and other general creditors. But it contains the following provision: 1 ‘Provided, however, that if, according to the proper legal construction of the act of the 12th of February 1866, a ratable distribution among all the creditors of the bank, not having specific liens on the property of the bank, be required, then the trustees shall apply and distribute the proceeds of the said assets according to the requirement of said act, and shall not make or attempt any distribution giving preference or priority to the noteholders as aforesaid. ’ ’
*This deed, and the act of assembly under which it was made, have received the judicial construction of this court. In Robinson & ais. v. Gardiner & als., 18 Gratt. 509, it was held, “that upon the true construction of this act, all the creditors of the bank, not having a specific lien, are placed upon the same footing, and are entitled to share the assets ratably.”
The second section of the act referred to makes a provision, the object of which is to prevent any creditor from obtaining by suit more than his just and ratable share in the distribution of the proceeds of the assets of the bank, and thus to preserve that equality of distribution contemplated by the first section. It, in effect, declares that each creditor of the bank is entitled to his ratable share in a fair pro rata distribution of the assets of the bank; and plainly implied that such is to be the rule of distribution.
I have thus noticed, with some particularity, the act of the 12th of February 1866, because, in my view of the case, a proper understanding of the purposes of this act, if it does not furnish a key to the solution *279 of the question before the court, at least advances one step towards solving the difficulty in the vra.y of a satisfactory conclusion.
It is evident that this statute was intended to secure the equal distribution of the effects of these corporations among their creditors ; and it was so express^ decided in the case of Robinson v. Gardiner (supra). A part of these effects were the debts due to these banks, and among others the debts due from these defendants.
These obligations of the defendants, along with the other assets of the banks, were assigned to trustees for the benefit of all the creditors of these corporations. Now, if the defendants are to be permitted to purchase the bills of the banks, and set them off against their obligations, the plain objects and ptirposes of the statute are totally defeated, and instead of the equal rights of *ail the creditors being secured (as was the design of the legislature), there would follow a most unequal and inequitable mode of distribution,in this, that these defendants (who are creditors as noteholders) would receive every dollar of their claims, while the other creditors would receive but a small proportion of theirs.
It must not be forgotten, that when, in conformity with the act of February 1866, these banks executed their respective deeds of assignment, the3T had ceased to exist for the purposes for which they were created. A resumption of their operations as banks was simply impossible. The stockholders had no longer any interest in them. It only remained to wind them up for the benefit of the creditors. Robinson v. Gardiner (supra). In this view, the grantees in said deeds were not trustees for the banks, but for the creditors only. Haxtun v. Bishop, 3 Wend. R. 13; Diven v. Phelps, 34 Barb. R. 224. The true principle, I conceive to be this: These corporations being insolvent, under the statute, and the deeds made in pursuance thereof, the rights of all the creditors attach equally to all their assets, and whoever takes their bills afterwards (being indebted to such corporations) rakes them subject to this right of all the creditors to share equally in their assets. His claim is upon the assets for his proportionate share. The statute, as well as the deeds of assignment, virtually secures to the creditors collectively the entire and exclusive right to all the assets. The debtor, therefore, must pay his debt, and take his dividend for his claim, arising from his ownership of the bills, acquired under such circumstances. It is true that a bank, as long as it is solvent, or rather, as long as it has control of its assets, is bound to take its own bills in payment of debts due to it; but when it becomes insolvent, and goes into liquidation, making an assignment of all its assets for the benefit of its creditors, the rights of all its creditors attach equally, and a debtor then takes the bills of the *bank subject to the rights of other creditors to enforce his obligation against him for the equal benefit of all. Diven v. Phelps, 34 Barb. R. 224 ; 9 Cowen R. 408, notes; 1 Paige R. 585 ; 3 Wend. R. 13. But independently of the act of 12th February 1866, the obligations enforced, and the rights established under it, according to the construction I have given it, it must be conceded, on general principles, that these notes of the banks, acquired after notice of the assignment, cannot be pleaded as set offs in actions brought by the assignees of the banks, unless these cases are taken out of the operation of the general and well-settled principles of law, in consequence of the provisions of the charters of these corporations, or of the general law regulating them. To this question I shall advert presently.
It is a principle of law, too well settled to admit of doubt or argument now, that a set off as between original parties, acquired after the assignment for a bona fide purpose, of the subject in controversy and notice thereof, cannot be set off against a holder for value. 12 Johnson R. 343; 1 John. Ca. 51; 5 Munf. 388; 14 Gratt. 1.
It is equally well settled that the trustees and beneficiaries in a deed of trust to secure bona fide debts, are purchasers for valuable consideration. A pre-existing debt is of itself a valuable consideration for a deed of trust executed for its security. Wickham, &c. v. Martin & Co., 13 Gratt. 427; Evans, trustee, v. Greenhow & als., 15 Gratt. 153.
In the first named case Judge Daniel says (and in this part of his opinion the whole court concurs with him): “I think it has been the constant course of the court in this State to regard the creditors in a deed of trust made b3* their debtor bona fide for their indemnity, in the light of purchasers for value.” Id. 437.
This opinion of Judge Daniel is quoted approvingly by Judge Moncure, delivering the opinion of the court *in Evans, trustee, v. Greenhow & als. (supra). A deed of trust is certainly an assignment of the subject matter in controversy, and the appellants (the trustees) are assignees for valuable consideration in the general sense of these terms.
But it may be said that the trustees in this case are assignees in law and not in fact; that the deeds were made under the mandate of the legislature and were not voluntary.
Admitting that this is true, does it alter the relations of the parties so as to change the principles of law applicable to questions of set off? I think not.
An assignee in bankruptcy is an assignee in law; and yet it is well settled that in an action brought by assignees in bankruptcy, the defendant cannot set off a claim against the bankrupt acquired after the bankruptcy. 6 Term R. 57; 2 John. R. 273. Chancellor Kent, delivering the opinion of the court in the latter case says (referring to the first named case): “The decision of King’s Bench in that case is founded in good sense and sound policy. It would, as iord Kenyon observes, be unjust, if one person, who happened to be indebted to an *280 other at the time of his bankruptcy, was permitted by any intrigue between himself and a third person, so to change his own situation as to diminish, or totally destroy, the debt due to the bankrupt by an act ex post facto.” Ib. 278.
And so administrators may be said, in a certain sense, to be assignees in law of debts due to their intestate, and yet it has been repeatedly decided that in an action brought by an administrator for a debt due to his intestate, the defendant cannot set off a debt due from the intestate purchased by the defendant after the death of the intestate. 20 John. R. 136; 2 Paige R. 402; 3 Paige R. 402.
Whether, therefore, these trustees are to be regarded as assignees in law or assignees in fact, the set off ^claimed by the defendants is equally inadmissible ; and there can be no reason why the well settled and universally recognized principles of the law of set off should not be applicable to these cases, unless indeed it be found in the charter of these corporations, or in the general(law regulating their operations. And this brings me to consider the argument which was pressed with so much earnestness and ability by the counsel for the appellees. It is insisted by them, and with great apparent force, that the fact that the assignment in these cases was made not by an individual, but by chartered institutions, which are required by the general law creating them and regulating their operations, to receive their own notes in payment of debts due to them, forbids the application of the general principles of law adverted to, and that for this, reason the right of the debtor to pay his debt in the notes of the bank cannot by affected by an assignment of that'debt to a third party. It is earnestly contended that the right of a debtor to the bank- to pay his debt in the bills of the bank is a part of the contract under which the bank issues its notes, which is inherent in the obligation, and follows it to whomsoever and for whatsoever purpose it may be transferred, and goes with it even into the hands of a bona fide holder for value. If the case is for the appellees, it is only upon these grounds. Tet us examine carefully and fairly these propositions. All these questions turn upon the true construction to. be given to section 16 of chap. 58, Code 1860, which is in the following words: “2 16. Though a bank have a branch, all its notes shall be signed by the president and countersigned by the cashier of the parent bank. All such notes shall be received in payment of debts to the bank,'whether contracted at the parent bank or branch.” Now, the exact meaning of this section may be discovered, 1st, by considering the terms in which it is couched, and their relations to each other; and, 2d, the mischief it was intended to remedy.
*It may be observed in passing, that the legislative mind in this section is directed to the subject of parent t?anks and branch banks, and not to the subject of the obligations of banks generally. “Though a bank have a branch, all its notes shall be signed by the president and countersigned by the cashier of the parent bank. All such notes (that is, notes signed by the president and countersigned by the cashier of the parent bank), shall be received in payment of debts to the bank, whether contracted at the parent bank or branch.” The last clause of this section was taken from the act 1836-7, entitled “an act establishing general regulations for the incorporation of banks.-” Section 9 contains the following provisions: “All bills or notes negotiable or pajrable at any office of discount and deposit of any bank, shall be placed on the legal footing of bills or notes negotiable or payable at the parent bank. And the notes of each shall be received at the parent bank or any of its branches in payment of debts due to any or either of them. ’ ’ The phraseology is different, but the meaning of these two provisions is precisely the same. The obvious meaning is this: that whether the debt is contracted with the parent bank or the branch bank, the notes of the parent bank, signed and countersigned by the president- and cashier of the parent bank, shall be received at the branch bank for a debt due to the branch bank; and so the notes of the branch, bank, signed and countersigned as required, shall be received at the parent bank for a debt due to the parent bank: or, in other words, the legislature meant simply to say, that when a debt to a bank became payable by its terms at the parent bank, the debtor should have the right to pay it there in notes of the bank, which, on their face might be redeemable at a branch of that bank; and on the other hand, that a like debt, payable at the branch bank, might be paid there in notes, which on their face were redeemable at the parent bank.
*The mischief to be remedied no doubt was, that in such cases, notes redeemable at the branches were refused at the parent bank, and notes redeemable at the parent bank were refused at the branches; and without such a provision as this, the debtor would be required to pay his debt either in specie or else in bank notes redeemable at the counter of the particular bank, whether parent or branch, at which the debt was payable. Such a practice would be inconvenient and vexatious, and it is plain to my mind that this was the mischief which the '£ 16, ch. 58 of the Code was intended to remedy. This being the plain object of the clause, it would be a strained interpretation, unwarranted by any sound rule of construction, so to apply this clause as to constitute a right of set off against a debt, which, though once due to a bank, had ceased to be so due, by reason of an assignment made, and known by the debtor to have been made, before the subject of the set off was acquired.
Such a construction cannot be fairly maintained. Nor can I perceive the force of the argument §o earnestly pressed by the *281 counsel for the appellees, that these provisions are incorporated in the charter of all the banks, and constitute a contract binding on them to receive their notes at par in payment of all debts due to them; and that this obligation follows the debt, no matter to whom or for what purpose it may be transferred or assigned. Such a proposition, carried out to its legitimate and logical conclusion, would lead to this absurd result: A note executed by A. to B., payable in gold, is transferred to the bank. As long as it is the property of the bank, it is conceded, it may be paid in the notes of the bank. But suppose the bank assigns this note for a valuable consideration to a third party; if the position of the appellees be right, then the note which originally was payable by B. in gold may be discharged ' in depreciated notes, though it be in the *hands of a third party for full value. But again, the effect of such a construction would destroy the negotiability of every note or bill of exchange which came into the possession of the bank; and once in its possession, it would become burdened with this condition (no matter into whose or how many hands it might pass), to be discharged in the notes of the bank, however depreciated, though originally it was payable in gold. Such must be the inevitable result of such a construction.
Now, as between the banks and the bill-holders, the law does make a contract that the bank shall receive its own notes in payment of a debt due to it by the bill-holder; but it must be a debt due to the bank, and when assigned to-a third party for value, it is then a debt due to the assignee, and not to the bank, and there is no obligation on the assignee to receive the notes of the bank, but the debt must be paid as other debts are paid. The truth is, that these provisions of the statute are, as before illustrated, simply laws regulating the payment at the parent banks and branch banks respectively of debts “due to any or either of them, ’ ’ and cannot be said to constitute a contract binding upon every party who may be the assignee or endorsee of the debt originally due to the bank. The case of “Woodruff v. Trapnall,” 10 How. U. S. R. 190, so much relied upon by counsel for the appellees, comes far short of establishing the principle for which it was invoked. When properly understood and applied, it does not at all conflict with the positions taken in this opinion. The case was this: In 1836 the legislature of Arkansas chartered a bank, the whole capital of which belonged to the State, and the president and directors of which were appointed by the general assembly. The 9th section of the act of incorporation provided “that the bills and notes of said institution shall be received in all payment of debts due to the State of Arkansas.” In 1845 this section was repealed. ^Woodruff was the treasurer of the State of Arkansas, and became a defaulter to a large amount. Suit was instituted on his official bond and judgment recovered, upon which execution was issued in 1847. Woodruff tendered in payment of this execution the notes of the bank issued before the repeal of the section referred to. And the question was, whether the State should be compelled to receive these notes in payment of this execution.
The court decided that the act of 1845, repealing the 9th section of the act of ’36, was unconstitutional, because it impaired the obligation of the contract created by that section between the State and the bill-holder to receive its own notes (the State being the bank in this case) in payment of debts due to it.
The judgment in this case was a debt due to the State of Arkansas, and the provision of law was, that the notes and bills of this institution shall be received in payment of all debts due to the State of Arkansas. This was clearly a case of contract, which could not be impaired by legislation. And so in the case before us, as long as the bank had control of its own assets, and carried on its operations as a bank, there unquestionably was a subsisting contract between the bank and the bill-holder to receive its own bills in payment of debts due to it. But when the bank parted with its assets, assigning them to trustees for the legitimate purpose of a fair and equitable distribution among its creditors, then the debts of the defendants are no longer debts due to the bank, but due to the creditors of the bank, being a part of its assets in the hands of the trustees for distribution. Therefore the decision of the Supreme Court, in Woodruff v. Trapnall, can have no application to this case.
I have said in the beginning, that these cases present a question which is without judicial precedent in this State. I have carefully examined the decisions of *the courts of other States to ascertain what has been the ruling of these courts on this question, and I find that, with a single exception (if that, indeed, can be considered an exception), the whole current of decisions have been in one direction ; to wit, that the assignees of a bank are not obliged to take from the debtor the notes of the bank obtained after notice of the assignment. This has been the uniform course of decision in New York. See 3 Wend. R. 13; 1 Paige R. 585; 1 Haw Reg. N. S. 238; 34 Barb. 224. The courts of Pennsylvania have decided the same way, 8 Watts & Serg. 311; Housum v. Rogers, 4 Wright R. 190, 40 Pa. So in Ohio, 1 Ohio R. 381, 376; 3 McLean R. 397. So in Kentucky, 16 B. Munr. R. 454; 1 Duval R. 85; and in Mississippi, King v. Elliott, 5 Smeedes & Marsh. R. 428. And such is the uniform judgment of all the courts where this point has been adjudicated, with the exception of the Court of Appeals of the State of Maryland. That court has decided (6 Gill & Johnson 263), that the assignees and trustees of an insolvent bank, authorized to collect its debts and pay its creditors, are bound, under the statutes of that State, to receive the notes of such banks without *282 reference to the time at which they were acquired. But that case is peculiar in this, that at a meeting of the board of directors of the bank, ’preparatory to the execution of the deed of trust, a resolution was adopted by said board to the effect, that ‘ ‘the debtors of this institution should have the privilege of paying their debts in notes of the bank. ” And the statute upon which the decision is founded, provides for the payment of debts due to the bank, whether solvent or insolvent, in the notes of the bank, whether it is carrying on its operations as a bank, or whether after the insolvency its assets have been assigned to commissioners, to wind it up for the benefit of its creditors. The decision is based upon the particular facts of the case, and the peculiar provision of the ^Maryland statute, and cannot be regarded as authority in the cases before us. But if there was no such peculiarity, and it was a case going to the full extent of the broad principle for which it was invoked by the counsel for the appellees, it could not be permitted to stand in the way of the unbroken current of decisions by the courts of New York, Pennsylvania, Ohio, Kentucky and Mississippi, and other States already referred to.
I have thus examined, somewhat in detail, the several grounds upon which the appellants and the appellees have put their claims before this tribunal, with the authorities upon which they rest them, and am constrained to conclude that the case is with the appellants, both upon principle and authority. And I am bound to say, too, all the equities of the case are against the appellees. They are seeking to ,pay in a depreciated currency that for which they received full value, and that, too, at the expense of others, who have equal rights with them, and in violation of that -just and equitable rule of distribution prescribed by an act of the general assembly. I am, therefore, of opinion, that the judgments in both cases should be reversed.