## IN THE

# SUPREME COURT OF APPEALS

## OF WEST VIRGINIA,

AT THE AUGUST TERM THEREOF, HELD AT CHARLES-
TOWN, IN THE COUNTY OF JEFFERSON, COM-
MENCING ON THE SIXTH DAY OF
AUGUST, 1873, AND ENDING ON
THE TWENTY-SECOND DAY
OF AUGUST, 1873.

---

## CHARLESTOWN.

### FARMERS' BANK *v.* WILLIS.

August 22, 1873.

1. The court may judicially recognize or inform itself as to the charter of the Farmers' Bank of Virginia, or other like bank, and as to its organization and acceptance of a provision for the extension of its existence.

2. The Bank had the right to assign its assets for the benefit of its creditors, independently of the act of the General Assembly of Virginia, passed in 1866, on that subject.

3. The deed made in 1867, by the Bank, when hopelessly insolvent, for the transfer of its assets to trustees for the payment of specific liens, and then, as far as adequate, for the payment of all its other debts, was valid and effectual for that purpose.

4. The provision in the Code of Virginia, that, "though a bank had a branch  *  *  *  all its notes should be received in payment of debts to the bank, whether contracted at the parent bank or a branch," applied only while the debts remained due to the bank. When a negotiable promissory note discounted by the Farmers' Bank of Virginia had been assigned by the Bank to trustees, for the payment of antecedent debts, and the maker, having notice of the assignment, afterwards acquired notes of the Bank, he could not, with these, pay his debt so assigned, or set them off against it.

5. When "The Farmers' Bank of Virginia," by that name, brought suit, and the defendants made no objection, on that account, but pleaded in bar, and agreed the facts, using that name, and the "President, Directors and Company of the Farmers' Bank of Virginia," indiscriminately, as the name of the same corporation, and submitted the case to the court, which gave judgment in favor of the Bank; the defendants, who appealed, cannot, in this court object successfully to the name in which the suit was brought.

6. A judgment having been entered for a larger amount than the facts agreed warranted, and subsequently, on motion of the plaintiff in whose favor the error was committed, and without notice, the error was corrected; the defendants, for whose benefit the correction was made, cannot for that reason, appeal or obtain a reversal of the judgment.

7. When, after the Farmers' Bank of Virginia had assigned its assets to trustees for its creditors, of which a debtor had notice, he acquired and tendered notes of the Bank in payment of his debt before the passage of the act in 1873, which provides that debts due to the banks or their trustees or representatives, may be paid in the issue of the banks or their branches, the tender cannot now by force of the statute, be treated as a payment. And a judgment rendered then, which was correct, should not now be reversed, to enable the debtor to make the payment, or otherwise have the benefit of the legislation. If he could pay the debt in that manner, without the judgment, he can pay it notwithstanding the judgment. Whether he can do this, is not now decided.

This was an appeal, by the defendants below, from a judgment of the circuit court of Jefferson county, rendered at the April term, 1869, thereof, in a suit therein pending, wherein the Farmers' Bank of Virginia, suing for the use of J. M. Goddin and Samuel Robinson, assignees and trustees, was plaintiff, and Thomas H. Willis and R. B. Washington, were defendants. The

Hon. Joseph A. Chapline, then judge of said circuit court, presided at the trial of the cause below.

The opinion of Hoffman, Judge, contains a sufficient statement of the facts, and recital of the statutes therein referred to.

*William H. Travers, George H. Lee* and *Cooke & Kennedy* for the appellant.

*Charles J. Faulkner* for the appellee.

HOFFMAN, JUDGE:

In the year 1812, it was enacted by the General Assembly of Virginia, (Acts 1811–12, ch. 7—2 R. C. 1819, ch. 196, secs, 1, 2, 5, 9, 11, 15, 20,) that the Farmers' Bank of Virginia should be established in the city of Richmond, with a capital stock of two million dollars, divided into twenty thousand shares of one hundred dollars each :

That there should be appropriated to the use of the Commonwealth three thousand three hundred and thirty-four of these shares : That books of subscription should be opened in Richmond, Norfolk, Lynchburg, Winchester, Fredericksburg and Staunton, under the superintendence of numerous persons, for the shares that were authorized to be subscribed at each of these places : That the subscribers should be a corporation, in law and fact, by the name of The President, Directors, and Company of the Farmers' Bank of Virginia, and should so continue till the first day of June, in the year 1827 : That there should be directors for the Bank at Richmond, and for a branch at each of the other places before named, who should be citizens of Virginia, and should be elected annually, a part of them by the General Assembly and a part by the stockholders :

That the General Assembly should be furnished, annually, if it should require it, with statements of the amount of the capital stock of the corporation, debts due to it, money deposited therein, notes in circulation and cash on hand ;

1873.
August Term.

Farmers' Bank
v.
Willis.

and should have the right to inspect the general accounts in the books of the Bank, that related to such statements :

That the directors of the Bank at Richmond should establish offices at Lynchburg, Winchester, Norfolk, Petersburg and Fredericksburg; for the purpose of discount and deposit upon the same terms and in the same manner as should be practiced at the Bank ; and that the capital stock should be distributed in the proportions specified.

In the year 1837, (Acts 1836–7, ch. 183, secs. 4–13), it was enacted that the President and Directors of the Farmers' Bank of Virginia should have authority to increase the capital stock of the Bank, by the addition of a million and ten thousand dollars, of which the Commonwealth should subscribe and hold one-half; and that the increase should be distributed among the Bank at Richmond and its branches, as by the act directed :

That, within six months after the new stock should be raised, offices of discount and deposit should be opened at Farmville, Scottsville and Abingdon, or Evansham.

Subsequently, at different times, by various acts, it was enacted that the charter of the Bank, with modifications, should be extended to the 1st day of June, 1842; and afterwards, with further modifications, and conditions, till the 1st of April, 1857 ; and thence for six years :

That the capital stock of the Bank might be increased and branches established at a number of other places in different parts of the Commonwealth.

And, accordingly, at different times the Bank at Richmond, and branches at Norfolk, Petersburg, Fredericksburg, Lynchburg, Winchester, Danville, Farmville, Charlottesville, Wytheville, Alexandria, Lewisburg and Blacksburg were organized and put and continued in operation.

It was enacted that the moneys of the Commonwealth should be deposited in the Farmers' Bank of Virginia and two other banks mentioned, a third part in each :

That the Governor should appoint a number of directors but one less than half of all, of each of the banks and branches in the State : And that the notes of these and other banks should be received in payment of taxes and debts due to the Commonwealth :

That the Board of Directors should quarterly transmit to the Governor a statement of the condition of the banks, which should be published in newspapers in the cities and counties where the banks and branches were situated : And that the Governor should cause to be prepared and submitted to the General Assembly, at each session, with the reports of the banks, a tabular statement as to each bank.

And it was enacted, and accepted, that the bank should pay to the Commonwealth a bonus out of each semi-annual dividend.

In the year 1861, (Acts 1861, ch. 58,) by an amendment to the last previous act, which extended the charter of the Farmers' Bank, it was enacted that the charter should be extended from the first day of April 1863, for twenty years ; and the Bank was invested with all the rights, powers and privileges, and made subject to all regulations imposed by the 56th, 57th and 58th chapters of the Code of Virginia, and the act to amend the 10th section of chapter 57 thereof, passed April 9, 1853, so far as the same might be applicable to banks of circulation, and to all the rights and liabilities that had accrued under an act to separate the State from the banks, passed March 18, 1856: That the act should commence and be in force on and after the 1st day of April, 1863 ; *provided*, it should have been approved by the stockholders in the Bank, at any time before the first day of February, 1862, and the approval should have been certified by the president and cashier of the Bank, under its corporate seal, to the Governor of the Commonwealth.

On the 6th day of June, in the year 1861, Willis made a note in writing, of that date, and delivered it to Wash-

ington, whereby Willis, for value received, promised to pay to Washington, or order, sixty days· after the date thereof, the sum of $2,500, negotiable and payable at the office of discount and deposit of the Farmers' Bank of Virginia, at Winchester: And, before the maturity of the note, Washington endorsed and delivered it to the Bank at its office at Winchester, for the accommodation of Willis, and it was by the Bank then discounted. When the note became due and payable, it was presented for payment, but was not paid: Whereupon, it was protested for non-payment, and notice of dishonor given to the endorser.

On the 27th day of February, 1867, the defendant paid $500, and on the 27th day of March, 1866, paid $412, upon the note.

On the 20th day of February, in the year 1866, it was recited by the General Assembly of Virginia, (Acts 1866, ch. 95,) that the banks of the Commonwealth, during the progress of the war then recently waged in the State, sustained such losses that they were unable to promptly pay their liabilities; and that it was the sense of the General Assembly, that a speedy settlement of the affairs of the banks should be made, in order to a legal and proper distribution of their assets among all persons entitled to share in them:

And, therefore, it was enacted that it should be lawful for the president and directors of any bank of circulation, created by the General Assembly, to make or cause to be made, a deed conveying to such person or persons as the president and directors might select, all the assets, real and personal, of such bank, providing in the deed, that the proceeds of the assets should be distributed among all persons entitled to share in the distribution, according to the legal rights and priorities of such persons, at the time the deed should be executed:

That whenever any creditor of such a bank should by any suit, or other legal proceeding, seek to obtain a judgment, decree or order that, when rendered or made,

would create a lien in his favor, upon the assets of the bank, or any portion of them, and entitle the creditor to receive more than his just and ratable share in the distribution of the proceeds of the assets, then, in order to preserve the rights of all the creditors to a fair *pro rata* distribution of the assets, and, for the purpose of effecting such distribution, it should be the duty of the president and directors of the bank, and they were required, to make such deed as before mentioned:

And that it should be the duty of the banks or their legal representatives, on the first day of April, and quarterly thereafter, until final liquidation, to publish in a public newspaper, nearest their location, a statement, under oath, of their condition, and to make distribution of the assets on hand, according to the provisions already stated, so far as it could be done consistently with the interests of all the creditors of the bank: But that nothing in the act should compel the president and directors or trustees, to make a final distribution before the expiration of three years next after the passage of the act.

On the 19th day of January, in the year 1867, the President, Directors and Company of the Farmers' Bank of Virginia, made a deed in which they recited the first provision of the act passed in the previous year, as already set forth; and that the President and Directors deemed it expedient and proper that a deed conveying all the assets of the Bank for the purposes in the act mentioned, should be made: And, therefore, in consideration of the premises, granted and assigned to John M. Goddin and Samuel Robinson, of the city of Richmond, all the assets, real and personal, of the Bank, wherever situated, including all lands and lots, office furniture and other personal chattels, current money, debts and choses in action, stocks, bonds and certificates of debt, bills, notes, accounts and other evidences of debt and securities therefor, and all other property,

whether real or personal, belonging or due to the President, Directors and Company, or to which they or the Bank were entitled: Upon trust, however, that the parties of the second part, or the survivor of them, should proceed without delay, to convert into current money, all the assets of the Bank thereby granted and assigned, not already in that form, by collecting the debts and choses in action; using the name of the Bank in suits for that purpose, when proper only; selling, transferring and assigning the debts and choses in action, or any of them, and selling the other property: And the proceeds of the assets, after deducting all costs and expenses of executing the trust and paying all the salaries due the officers of the bank, and reasonable fees and compensation for other services rendered the Bank while its general operations were suspended, apply to the redemption of the outstanding circulation or notes of the Bank, ratably among the holders who should present them to the trustees for redemption within six months after publication of notice by the trustees, in two or more newspapers printed in the city of Richmond, calling on the holders to present them; but so that none of the note holders who had theretofore received any partial payment on account of notes held by them should be entitled to any further payment until all other note holders presenting notes to the trustees for redemption should have received a payment equal to that received by the others; and the residue of the proceeds, if any, apply to the satisfaction of all outstanding debts and liabilities: Provided, however, that if, according to the proper legal construction of the act of the 12th day of February, 1866, a ratable distribution among all the creditors of the Bank not having specific liens on its property, be required, then the trustees to apply and distribute the proceeds of the assets according to the requirements of the act.

The deed was acknowledged on behalf of the Bank, and recorded, and Willis and Washington had notice of it.

After such notice, Willis and Washington procured notes of the bank, and on the 5th day of May, 1867, tendered these notes to the amount of $2,323.47, the residue of the debt and interest due by the note and costs of protest, to the Bank, at its office at Winchester; but the Bank refused to receive them.

On the 25th day of July, in the year 1868, an action of debt in the name of the Farmers' Bank of Virginia, for the use of Goddin and Robinson, assignees and trustees, was brought in the circuit court of the county of Jefferson, against Willis and Washington, and at rules in that month a declaration was filed, in which was demanded the sum of $2,500, for which Willis made the note payable to Washington at the office of the Farmers' Bank, at Winchester, endorsed by him, and discounted at that office, with interest and notarial charges.

At the next August term of the court, the defendants pleaded that they did not owe to the plaintiff the residue of the sum demanded, except $2,323.47; and that at the time when the last mentioned sum became due and payable, they had been, and were, ready to pay to the plaintiff; the sum just mentioned, at the office of discount and deposit of the Farmers' Bank of Virginia, at Winchester; and that when it became due, before the commencement of the suit, to-wit: on the 5th day of May, 1867, at the office at Winchester, they were ready and willing, and tendered and offered to pay to the plaintiff, the sum mentioned, but the plaintiff refused to receive it; and the defendants—as they alleged—brought the sum so tendered into court, ready to be paid to the plaintiff, if it would accept it. And the defendants in fact did bring into court and file notes of the Farmers' Bank, amounting to the sum of $2,766, which were, by the order of the court, deposited with the clerk thereof. And the plaintiff demurred to the plea, and the defendants joined in the demurrer.

The defendants likewise pleaded payment, and notified the plaintiff that, at the trial, they would rely on,

as set-offs, notes of the Farmers' Bank of Virginia, signed by the President and countersigned by the Cashier of the Bank, payable to the bearer, amounting to $2,334, and payments of $500, made 27th of February, 1862, and $412, made 27th of March, 1866.

And the parties joined issue on the plea.

And the plaintiff agreed that the defendants might give in evidence any matter that could proved under any special plea in bar, good in law.

And the parties agreed the facts and waived a trial by jury, and agreed that the court should enter judgment according to the very right of the case.

The facts agreed are those already stated, relative to the making, endorsement, discount and dishonor of the note of $2,500, and notice thereof; payment of $500 and $412; the act of the General Assembly of Virginia, passed 12th of February, 1866; the execution of the deed made by the President, Directors and Company of the Bank, and the acknowledgment and recordation of the deed, and notice to Willis and Washington thereof, before the acquisition of the note of the Bank; the tender of such notes to the amount of $2,323.47; and the refusal to receive them in payment, and the bringing them into court; and the identity of the notes with those brought into court.

At the April term, in the year 1869, the court, upon the issue and facts, reciting that the notes of the Bank were acquired by the defendants after the assignment by the Bank, with notice thereof; considered that the plaintiff recover against the defendants the sum of $2,085.63, with interest from the 27th of February, 1862, till paid, and costs.

On the 24th of July, 1869, the defendants took an appeal from the judgment.

At the September term of the court, in the year 1871, the Bank, for the use of Goddin and Robinson, its trustees, appeared by its attorney, and acknowledged that

there was an error in the judgment rendered at the
April term, 1869, in this, that there was an omission to credit the defendants with the payment of $412, made on the 27th March, 1866, admitted in the case agreed, and that the judgment should have been for the sum of $2,-323.47, as set forth in the plea, with interest from the 5th May, 1867, and not for the sum of $2,085.63, with interest from the 27th February, 1862; And, therefore, at the request of the plaintiff, it was ordered that the correction and amendment be made, and the judgment be regarded as rendered for the sum of $2,323.47, with interest from the 5th of May, 1867.

In the present year, 1873, some years after the assignment made by the Farmers' Bank to trustees for creditors, and after the rendition of the judgment and taking of the appeal in this case, it was enacted by the Legislature of this State, (Acts 1872-3, ch. 40,) that debts, whether by judgment, execution, or of any other character, due the banks of Virginia, or of this State, or their branches prior to the 5th day of April, 1865, or their agents, trustees or representatives, may be paid in the issue of such banks, or their branches, for circulation.

It is argued, by the counsel for the defendants, that the Farmers' Bank expired on the 1st day of April, 1863, and consequently, that it had no capacity to make the deed dated the 19th January, 1867.

We have information outside the case in judgment, that before the time limited by the act passed in 1861, the Farmers' Bank, in general meeting of the stockholders, did approve the provisions of the act, and the President did certify the approval to the Governor, in fact, of that part of the Commonwealth in which the Bank was situated; and that after the 1st day of April, 1863, the Bank continued to do business.

It needs but a slight glance at the legislation relative to the Farmers' Bank, and other banks of like charac-

acter, and little knowledge of their operations, to understand that their action materially influenced the finances and business of the Commonwealth and affected every class of her citizens. Public officers and private persons alike had the interest and the means to ascertain their condition and operation.

Accordingly, it was held by the Court of Appeals of Virginia in the case of *Stribling v. The Bank of the Valley*, 5 Rand, 132, and *Hays v. The Northwestern Bank*, 9 Gratt. 127, that the acts of the General Assembly incorporating these banks were public acts, of which the courts would take notice. The charter of the North Western Bank was twice extended, upon condition of acceptance, before the case of *Hays v. The Bank* arose: Yet the action was sustained without admission or proof of the creation or extension of the Bank. So that, though this was not mentioned, it was decided by implication, not only that the court should take judicial cognizance of the original organization of the Bank, but likewise the acceptance, by the latter, of the act for the extension of the charter.

And it was held by the Supreme Court of Appeals of this State, in the case of *The Farmers' Bank of Virginia v. Gettinger*, 4 W. Va. 305, that the Bank is, in this State, a domestic corporation.

But the consideration whether we can judicially know or inform ourselves, as to the acceptance by the Farmers' Bank of the provisions of the act to extend its charter, or its continuing to do business after the expiration of its former charter, before or after the erection of this State, is not indispensable to the adjudication of this case.

At the revisal of the Code of this State in 1868, it was provided, (ch. 13, sec. 4), that whenever, in any case, it becomes material to ascertain what the law, statutory or other, of another State or country, or of the United States, is, or was, at any time, the court, judge, or mag-

1873.
August Term.

Farmers' Bank
v.
Willis.

istrate, shall take judicial notice thereof, and may consult any printed books purporting to contain, state, or explain the same, and consider any testimony, information or argument that is offered or before the court, on the subject.

Under this provision, we may, without hesitation, recognize the act of the General Assembly of Virginia, passed in 1866, the pertinent provisions of which, if any be material here, have been recited.

It was agreed in this case, that on the 17th day of January, 1867, the President, Directors and Company of the Farmers' Bank of Virginia, executed the deed which is set forth. "The President, Directors and Company of the Farmers' Bank of Virginia," is the full and exact name of the corporation : And the fact that the Bank executed the deed implies that the corporation existed and retained the capacity to make the deed effectually.

Not only this special instance, but the general tenor of the facts agreed, indicates that the Bank existed and acted till the execution of the deed.

The Bank had, unquestionably, the right to assign its assets for the benefit of its creditors, independently of the act of the General Assembly of Virginia, on that subject. Burrill on Assignments, pp. 602–624 ; Abbott's Digest Law of Corporations, pp. 43–46 ; and numerous cases cited in these books.

The act and deed in question have both been construed and sustained by the supreme court of appeals of Virginia.

In the case brought by *Gardiner and others against the President, Directors and Company of the Farmers' Bank*, in March, 1867, soon after the execution of the deed, from the decree in which Gardiner and others appealed, (18 Gratt., 509,) Judge Joynes, pronouncing the opinion of the court, said :

"The events of the late war reduced all the banks of circulation in the State to a condition of utter and hope-

less insolvency. They suspended business from neces- sity, and there was no possibility of a resumption. It only remained to wind them up, and to distribute among their creditors such remnants of their assets as might be realized. In this condition of things, and to accomplish this object effectually and upon equitable terms, the act of February 12, 1866, was passed. It is entitled, 'An act requiring the banks of this Commonwealth to go into liquidation.' It proceeded, however, upon the assump- tion, that the banks were already in a course of liquida- tion, forced upon them by the calamities of the war, and its purpose was to provide regulations by which, as re- cited in the preamble, 'a speedy settlement of the affairs of said banks should be made, in order to a legal and proper distribution of their assets amongst all persons entitled to share in such distribution.'

"The first section of the act plainly contemplates that the deed shall recognize and respect existing priorities, which neither the bank nor the Legislature could de- stroy or impair; but it gave no authority to create new ones.

"The second section in effect declares, that each credi- tor of the bank is entitled to his 'ratable share' in 'a fair *pro rata* distribution' of the assets of the bank, and plainly implies that such is to be the rule of distribution in case no deed shall be made. The deed is required to be made only when it shall become necessary to prevent a disturbance of this rule of distribution; the object of the deed is not to establish the rule, but to 'preserve' it.

"I have already shown that the establishment of a general rule of distribution, which could not be defeated or disregarded by the banks, was no invasion of their rights. And it was eminently just and proper. Among creditors having no legal priorities, equality was equity. The banks had ceased to exist for the purposes for which they were created. A resumption of their operations as banks was impossible. The stockholders had no longer

any interest in them. It only remained to wind them up for the benefit of their creditors.

"It remains to enquire, whether the noteholders were entitled to priority over depositors or other general creditors. They had no lien, and therefore no priority at law. Nor is there any rule of equity upon which they could claim priority. It was so held by the Supreme Court of Massachusetts in *Stockholders of Cochituate Bank v. Colt,* 1 Gray (Mass.) 382."

In the cases of the *Exchange Bank of Virginia, for the benefit of Crump, Trustee v. Knox,* and *The Farmers' Bank of Virginia, for the benefit of Goddin and Robinson, Trustees v. Anderson* & Co., 19 Gratt., 739, Judge Christian, pronouncing the opinion of the court, said substantially the same thing.

According to these decisions, the specific provisions in the deed give place to the proviso that, if, according to the proper legal construction of the act, a ratable distribution among all the creditors of the bank not having specific liens be required, then the trustees shall distribute the proceeds according to the requirements of the act.

The effect of the deed is to provide for the distribution of the assets not subject to specific liens, among the creditors generally.

The promissory note in question in this case was payable and discounted, and the deed of assignment was made in Virginia. The Bank and office of discount and deposit were situated, and, as appears by the deed, Goddin and Robinson, the assignees in trust for the creditors resided, in that state. Whether Willis and Washington were citizens or residents of Virginia or West Virginia, or either, when the note was made and endorsed, when the act was passed, or when the deed was made, is not shown. It certainly cannot be inferred from anything in the case that they resided in this State at the time of the passage of the act of 1866, or the execution of the deed, or at any time previous to the institution of the suit. But this is not deemed material.

We think the act of the General Assembly, as construed by the supreme court of Virginia, embodies what was the law before, with convenient additional regulations; that the law was just and expedient, and, as far as pertinent, furnishes the rule for the adjudication of this and like cases, in this State. And we think the deed was valid and sufficient to effect the transfer of the promissory note in question, and other assets of the Bank, to the trustees for the payment, ratably, as far as adequate, of the debts of the Bank.

The defence made by the pleas, is urged here as sufficient. It is argued that by the legislation on the subject, bills of exchange, promissory notes or other debts at any time due the bank, though assigned to a trustee for the payment of creditors ratably, may, nevertheless, be paid or set off by notes of the bank, however depreciated, procured by the debtor of the bank after notice of the assignment.

The statutory provisions relied on to sustain this position are incorporated in the Code of 1849, (ch. 58, sec. 11 . ch. 144, sec. 7; copied in the Code of 1860, same ch. secs. 16, of the former and 7 of the latter.) They are as follows:

"Though a bank have a branch, all its notes shall be signed by the president and countersigned by the cashier of the parent bank. All such notes shall be received in payment of debts due to the bank, whether contracted at the parent bank or a branch."

"Every promissory note, or check for money, payable in this State at a particular bank, or at a particular office thereof, for discount and deposit, or at the place of business of a savings institution or savings bank, and every inland bill of exchange, payable in this State, shall be deemed negotiable."

These provisions should be construed together, so that the one shall not disappoint the purpose or impede the more important operation of the other.

One of the ordinary rights of a bank or other corpo-
ration, as a legally constituted artificial person, is to dis-
pose of its effects.

This is expressed in the charter of the Farmers'
Bank. Generally, a bank may convey or transfer its
property in possession, or choses in action, either for a
new consideration, or to satisfy or secure a pre-existing
debt. When a bank is insolvent, or in danger of in-
solvency, the just principle of equality in part payment
of creditors, alike entitled to satisfaction, suggests not
only the legal right, but the moral duty of an assign-
ment, or other measure, to secure and effect a ratable
distribution of its assets among such creditors. When
the assignment is to trustees to secure antecedent debts,
these constitute a valuable consideration entirely ade-
quate to sustain the assignment, which becomes com-
pletely effectual to protect the creditors against demands
thereafter acquired by any one. *Wickham and Goshorn
v. Martin & Co.*. 13 Gratt. 427 ; *Evans, Trustee, v. Green-
how*, 15 Gratt., 153.

It is important, not only to banks, but to all persons to
whom bills of exchange and promissory notes held by a
bank may be endorsed, or in any manner transferred,
that, according to the contract, interpreted by the mer-
cantile law generally applicable to the subject, they be
payable to the holder in money, without condition or
defalcation, and without extinguishment, in whole or in
part, by the set-off of demands against the bank acquired
after delivery or notice of the assignment.

The construction of the law in question, urged by
counsel, would make any bill of exchange or promissory
note payable at the bank, or once held by it, in fact pay-
able, not in money without defalcation, but in deprecia-
ted, and, perhaps worthless currency, and thus destroy
one of the distinguishing and most important character-
istics of negotiable paper ; it would make it necessary for
whoever would purchase or receive in payment any such
note or bill, to learn the entire financial condition of the

1873.
August Term.

Farmers' Bank
v.
Willis.

bank; and ascertain the market value of its notes issued for circulation, in order to ascertain the actual value of the bill of exchange or promissory note sought to be negotiated; it would make assignments of such bills or notes, for the ratable payment of the debts of the bank, to a greater or less extent unavailing; while it would enable calculating speculators, who received gold or its equivalent, in consideration of their bills or notes made or endorsed to the bank, even after notice of endorsement to a holder who paid full value for it, or after an assignment for the payment of debts, to purchase or procure the depreciated currency of the bank, at any price, however inconsiderable, and with this to pay the debt in the hands of the endorsee or the trustee for creditors.

We do not believe the legislation on this subject was intended, or should be construed to have such effect.

We think the provision in question, that all "notes shall be received in payment of debts to the bank," applies only while the debts remain due and payable to the bank. When they have been endorsed or assigned and the title has passed from the bank to another holder or owner, they are no longer debts to the bank or payable in the notes of the bank, or subject to extinguishment by the set-off of notes, unless the latter were acquired by the debtor before endorsement and delivery or assignment of the bills of exchange or promissory notes, and notice thereof to him.

This subject has been fully discussed and carefully considered, and the questions involved in this case decided by the supreme court of appeals of Virginia, in two late cases.

In *The Exchange Bank of Virginia, for the benefit of Crump, Trustee, v. Knox, &c.,* and *The Farmers' Bank of Virginia, for the benefit of Goddin and Robinson, Trustees, v. Anderson & Co.,* 19 Gratt., 339, Judge Christian, pronouncing the opinion of the court, said:

"When, in conformity with the act of February, 1866, these banks executed their respective deeds of assign-

ment, they had ceased to exist for the purposes for which
they were created. A resumption of their operations as banks was simply impossible. The stockholders had no longer any interest in them. It only remained to wind them up for the benefit of their creditors. *Robinson v. Gardiner*, (*supra*). In this view, the grantees in said deeds were not trustees for the banks, but for the creditors only. *Haxtun v. Bishop*, 3 Wend. 18; *Diven v. Phelps*, 34 Barb. 224. The true principle, I conceive to be this: These corporations being insolvent, under the statute, and the deeds made in pursuance thereof, the rights of *all the creditors* attach equally, *to all their assets*, and whoever takes their bills afterwards (being indebted to such corporations,) takes them subject to this right of all the creditors to share equally in their assets. His claim is upon the assets for his proportionate share. The statute, as well as the deeds of assignment, virtually secures to the creditors collectively, the entire and exclusive right to all the assets. The debtor, therefore, must pay his debt, and take *his dividend* for his claim, arising from his ownership of the bills, acquired under such circumstances. It is true that a bank, as long as it is solvent, or rather, as long as it has control of its assets, is bound to take its own bills in payment of debts due to it; but when it becomes insolvent, and goes into liquidation, making an assignment of all its assets for the benefit of its creditors, the rights of all its creditors attach equally, and a debtor then takes the bills of the bank subject to the rights of other creditors to enforce his obligations against him for the equal benefit of all. *Diven v. Phelps*, 34 Barb. 224; 9 Cowen 413, notes; 1 Paige Ch. 585; 3 Wend. 13. But independently of the act of 12th February, 1866, the obligations enforced and the rights established under it, according to the construction I have given it, it must be conceded on general principles, that these notes of the banks, acquired *after* notice of the assignment, cannot be pleaded as set-offs in ac-

7

1873.
August Term.

Farmers' Bank
v.
Willis.

tions brought by the assignees of the banks, unless these cases are taken out of the operation of the general and well settled principles of law, in consequence of the provisions of the charters of these corporations, or of the general law regulating them. To this question I shall advert presently.

"It is a principle of law, too well settled to admit of doubt or argument now, that a set-off, as between original parties, acquired after the assignment, for a *bona fide* purpose, of the subject in controversy, and notice thereof, cannot be set-off against a holder for value. 13 Johnson, 322; 1. Johns. Ca. 51; 5 Munf. 388; 14 Gratt. 1.

"It is equally well settled that the trustees and beneficiaries in a deed of trust to secure *bona fide* debts, are purchasers for valuable consideration. A pre-existing debt is of itself a valuable consideration for a deed of trust executed for its security.

"As between the banks and the bill-holders, the law does make a contract that the bank shall receive its own notes in payment of a debt due to it by the bill-holder; but it must be a *debt due to the bank*, and when assigned to a third party *for value*, it is then a debt due to the assignee, and not to the bank, and there is no obligation on the assignee to receive the notes of the bank, but the debt must be paid as other debts are paid. The truth is, that these provisions of the statute are, as before illustrated, simply *laws regulating the payment at the parent banks and branch banks respectively* of debts '*due to any or either of them,* and cannot be said to constitute a contract binding upon every party who may be the assignee or endorsee of the debt originally due to the bank.

"I have carefully examined the decisions of the courts of other states to ascertain what has been the ruling of these courts on this question, and I find that, with a single exception, (if that, indeed, can be considered an exception,) the whole *current* of decisions has been in one direction, to-wit: that the assignees of a bank are not obliged to take from the debtor the notes of the bank

obtained after notice of the assignment. This has been the uniform course of decision in New York; See 3 Wend. 13; 1 Paige Ch. 585; 1 Law Reg. N.S. 238; 34 Barb. 224. The courts of Pennsylvania have decided the same way; 8 Watts and Serg. 311; *Housum v. Rogers*, 40 Pa. St. 190. So in Ohio; 1 Ohio, 381, 376; 3 McLean, 397. So in Kentucky; 16 B. Mon. 351; 1 Duval, 84: And in Mississippi; *King v. Elliott*, 5 Smedes and Marsh., 428."

In the case of *Saunders v. White*, 20 Gratt., 327, these principles were re-affirmed.

It was held by the Supreme Court of Appeals of this State, in the case of the *Farmers' Bank v. Gettinger*, 4 W. Va., 305, that a debtor of a bank, summoned as a garnishee, could not afterwards procure the notes of the bank and pay them or set them off, in satisfaction or discharge of the debt. We cannot see that the right of the assignee in trust for creditors is inferior to that of an attaching creditor.

It is argued that the action could not be maintained in the name of the "Farmers' Bank of Virginia," and that this objection may now be made here.

The act for the charter of the bank is entitled, "An act incorporating the Farmers' Bank of Virginia." In the first section of the act it is provided "that a bank shall be established in the city of Richmond, to be called the 'Farmers' Bank of Virginia.'" Though, in the ninth section, it is provided that the subscribers, their successors and assigns, shall be, and they were, by the act, made a corporation and body politic, in law and fact, by the name and style of the "President, Directors and Company of the Farmers' Bank of Virginia." From the creation of the Bank to the present time, in acts of the General Assembly, and in opinions of the courts, as well as in other documents and ordinary conversation, the corporation has generally been mentioned by the former name. In the title and body of the last act extending its charter, it is designated thus, and not

otherwise. Throughout the States of Virginia and West Virginia, the Bank has been, and is commonly known by that name.

The defendants made no objection in the circuit court because of the name in which the suit was brought: They pleaded in bar, agreed the facts, treating "Farmers' Bank of Virginia," and the "President, Directors and Company of the Farmers' Bank of Virginia," indiscriminately, as the name of the same corporation; and, finally, submitted the case to the decision of the court. Clearly, the defendants, who appeal, cannot urge this objection, successfully, here.—3 Rob. Pr., 339, and authorities there cited; 12 Leigh, 91, and authorities there cited.

It is argued that the judgment having been entered for a larger amount than the agreement of facts warranted, the order of the circuit court correcting the error must be disregarded, and the original judgment, without the amendment, must be considered and reversed.

It is provided in the Code, chapter 134, section 5, among other things, that the court, in which is rendered a judgment, wherein there is any mistake or miscalculation of any sum or quantity, when it is right in any part of the record or proceedings, or when there is any verdict, report of a commissioner or other writing, whereby the judgment or decree may be safely amended, may, on the motion of any party, amend the judgment according to the truth or justice of the case:

It is further provided, that any motion under this section, shall be after reasonable notice to the opposite party, his agent or attorney.

Under this section, the court has jurisdiction, by reference to the agreement of facts, to correct the error. There was no notice of a motion, but it was made by the plaintiff in whose favor the error was committed. The plaintiff, then, could not appeal from, or complain of, the order made on his own motion. The correction was for the benefit of the defendants, who are the appellants

here. If they had been prejudiced, by the order of
amendment, they might have appealed ; but they were not prejudiced, and, therefore, have not, and could not have, appealed.

And, finally, reference is made, by the counsel, to the act passed this year, providing that debts, by judgment or otherwise, due to the banks of Virginia, or this State, or their trustees or representatives, may be paid in the issue of the banks or their branches ; but no suggestion is made as to what is the effect of the act, or how it can influence the decision of this case.

The notes of the Farmers' Bank were, by the holders, merely tendered before the action was brought ; and, afterwards, during its pendency, were, by the defendants, brought into court and filed, and, at their instance, by the court, ordered to be deposited with the clerk. This was entirely ineffectual for the purpose intended. It was neither a legal payment, set off, or anything equivalent to the one or the other. As it did not then constitute a payment, it cannot now be treated as such. At the time of the decision of the court against the validity of the tender, or afterward, the defendants had the right, upon leave, to withdraw the notes, and use them legitimately, as they thought proper. If they have not done so, they may still apply to the court, obtain the leave and withdraw the notes; and use or dispose of them in any manner that they might do if they had not filed them in the case. But whether, under the late legislation, they may pay their debt assigned to the trustees for creditors, with these notes, acquired after notice of the assignment, and thus discharge the judgment, need not be considered.

For the reasons stated the judgment of the circuit court, as corrected, is affirmed, with damages and costs.

The other Judges concurred.

JUDGMENT, AS CORRECTED, AFFIRMED.