CHRISTIAN, J.
delivered the opinion of the court.
This was an action of slander and is before us upon a writ of error to a judgment of the Circuit court of Albemarle. The first error assigned in the petition, is the refusal of the court to permit the defendant to file a plea alleging that since the action was brought the plaintiff had been adjudicated a bankrupt. The court is of opinion that there was no error in rejecting the plea. It has been held in numerous decisions, English and American, that under the English bankrupt acts and the act of congress of 1841, the rights of action which are transferred to the assignee, do not involve claims for personal damages. They are rights of action founded upon beneficial contracts made with *the bankrupt where the pecuniary loss is the substantial and primary cause of action, and for injuries affecting his property, so far as they do not involve a claim for personal damages.
A right of action, such as slander, which is merely personal, and dies with the party, is not transferred to the assignee. The assignee, in many respects, stands in the same relation towards the bankrupt’s estate as that of an executor towards the personal estate of his testator. The proper and reasonable construction would seem to be, that the statute transfers all such rights of action as would be assets in the hands of an executor for the payment of debts, and no others; all which could be turned to profit; for such rights of action are personal •estate. Of such, the executor is assignee in law ; and the nature of the office and duty of a bankrupt’s assignee, requires that he should have them also. But rights of action for torts, which would die with the testator, according to the rule actio personalis mori-tur cum persona, and all action affecting the person only would not pass. James’ Bankrupt fiaw, pp. 38, 39, and cases there cited.
The learned counsel for the appellant concedes in his argument, that it is clear that if the question had arisen under the English bankrupt act, or under the act of congress of 1841, the plea would have been properly rejected. But he insists that the words choses in action being inserted in the present act, and those words not being found in the former acts referred to, gave to the present act a wider scope and larger signification. We do not concur with the learned counsel in this interpretation. The words “choses in action” mean nothing more and can have no broader signification than the words “rights of action,” and it has been uniformly held that these latter *words, “rights of action,” only include rights of action founded on contracts, or for injuries to property, and not rights of action ■ for torts, which are purely personal, such as the action for slander, which dies with the person, and never survives to the personal representative. This interpretation of the present act seems to have received judicial sanction in the Circuit courts of the United States. See Bump on Bankruptcy, (6th ed.) 357; 5 B. R. 152; 3 C. B. N. 297.
The court is therefore of opinion that the Circuit court did not err in rejecting the plea of bankruptcy.
The court is further of opinion that the words charged in the declaration, and proved to have been spoken by the defendant, were not, under the circumstances, such as fall within the class of confidential or privileged communications. The words charged in the declaration were as follows: “He (the plaintiff) and all his sons are horse thieves, and make their living by that means, and that they frequently harbored that kind of men.” Eottr witnesses testify that these words were spoken to them substantially as laid in the declaration. Three of them lived upon lands rented of the defendant, and were the near neighbors of the plaintiff. One of them lived at the mill, being the miller of the defendant.
One of these witnesses (Thomas J. Rowland) says in answer to the question, “Bid the defendant make any statement to you and the Shropshires in regard to the plaintiff about horse-stealing? “He did at different times. I do not recollect how often. He said that Mr. Collins and his boys were horse thieves, and that they were connected- with that class of men, and I had better be careful and not make any acquaintance with them, that their bad character might injure my character; *that there would come strangers there frequently in the back way in a very suspicious manner, and leave in the same way, and in a day or two there would be horses missing from the neighborhood.” In answer to the question, “Bid Billard make these statements to you and the Shropshires, all being present, or to you alone?” He says, “In both ways. He did to me alone, and in their presence.”
Another witness (John W. Shropshire) states: “The first time I heard Billard say anything disrespectful of Mr. Collins was about the 19th March, 1866. He then warned me and my brother Gilbert and Mr. Rowland to avoid the company of Mr. Collins, saying that Collins and his sons were horse thieves, that they made their living by stealing horses and harboring horse thieves.”
*402 Speaking' of another occasion, he says: “He carne past the barn where we were at work, and riding up to the door, said to us that we had better watch our horses that night, as he (Dillard) had heard two strange men enquiring the way to Collins’. He stated when he left that some one would lose some horses; that they were a part of the clan who usually assembled at Collins’, and when ever they assembled there some one was sure to lose horses, and that as we had good horses we had better watch them; and on account of this warning we kept guard over our horses every night for some time after that. ’ ’ Witness further stated, that he afterwards learned that the men referred to by Dillard were men belonging to a slate roofing company doing business near Charlottesville, who having heard that there was a slate mine on the farm of Collins came to see the quality of the slate. “
Another witness (Gilbert Shropshire) says: 1 ‘My ^brother, myself and Mr. Rowland settled in Albemarle county, Virginia, in March 1866, on Mr. Dillard’s farm. Sometime after we went there, Mr. Dillard visited us frequently, and upon some of those occasions told us we had better have nothing to do with Collins and his sons; that they were horse thieves, and we had better watch our horses, Mr. Collins or some of his guests would steal them; that they made their living that way, and harbored that kind of men; that strangers came there and soon disappeared through the back part of their farm, and that horses would be missing from the neighborhood. Ror a month or two after Mr. Dillard told us this, some of us slept in the stable every night, and kept a close watch of our horses, and of Collins and his family; but we gradually got acquainted with them, and found them good neighbors and gentlemen, and was then satisfied that what Dillard told us was untrue. ’ ’
Another witness testified that “he was employed by defendant to attend his grist and saw mill; that defendant said to him he did not know how Collins and his sons rode such fine- horses and wore such fine clothes; they could not do it by their pump-boring, for they hardly ever worked; that they got their living by horse-stealing and negro-trading. That defendant told him to watch them and see that nothing was taken from the mill. Witness understood at the time that defendant told him this, that the object of his statement was to put the wit-, ness on the watch to see that nothing was taken about the mill.”
It will thus appear from these extracts taken from the evidence, that the slanderous words laid in the declaration were fully proved to have been uttered to at least four witnesses. It will be observed that there were two pleas upon which issue was joined, one, *“not guilty,” and the other, justification. Upon these two issues the parties went before the jury, who were to decide first, whether the defendant was guilty or not guilty of speaking the slanderous words; and if they believe him guilty, they are next to consider whether he has proved that the specific words are true or not. The proof of speaking the words substantially as charged is conclusive, and there is not a particle of evidence to sustain the plea of justification.
Under the plea of “not guilty” the defendant might have shown, in mitigation of damages, under the decisions of this court, the general bad character of the plaintiff for honesty; (see McNutt v. Young, 8 Leigh 542) ; but in this, too, he wholly fails. He relies exclusively upon the defense that the words spoken “fall strictly within the class of confidential or privileged communications; and that they were uttered bona fide, not with the malicious purpose of injuring the plaintiff, but with a view to the protection of his own interests, or the interests of the person to whom they were spoken.”
It is a familiar and well settled rule of law, that in every instance of slander, verbal or written, malice is an essential-ingredient; it must in either be expressly or substantially averred in the pleadings, and whenever thus substantially averred, and the language, either written or spoken, is proved as laid, the law will infer malice, until the proof, in the event of denial, be overthrown, or the language itself be satisfactorily explained. There is but one exception to this rule, and that is where the words spoken or written fall within the category of what the law characterizes as confidential or privileged communications. The legal effect of this exception is simply to change the ^burden of proof. Where the words spoken or written are shown to be within a confidential or pivileged communication, the presumption of malice no longer exists; but the plaintiff, in such a case, must show express malice, and cannot rely on the presumption of malice which the law attaches in all other cases to the utterance or publication of the words spoken or written. But even in such a case it is for the jury to determine whether (where the words written or spoken without doubt come within the scope of confidential or privileged communication), they were uttered or published maliciously.
The appellant in this case invokes this exception to the general rule, and insists that what he said of the appellee falls strictly within the class of confidential or privileged communications recognized by the law. It becomes necessary, therefore, to enquire into the peculiar character of such communications, and the extent of their influence upon words spoken or written, as to which, apart from that character, the law will imply malice.
I know of no treatise or decision where this subject is treated with more clearness and precision than in the opinion of the Supreme court of the United States delivered by Mr. Justice Daniel in White v. Nicholls, 3 How. U. S. R. 266. After a careful and elaborate review of the authorities on the subject, he says: “The exception relied upon belongs to a class which, *403 in the elementary treatises and in decisions upon slander and libel, have been denominated privileged communications or publications. They are as follows: 1. Whenever the author or publisher of the alleged slander acted in the bona fide discharge of a public or private duty, legal or moral, or in the prosecution of his own rights or interests. Eor example, words 'x'spoken in confidence and friendship as a caution, or a letter written confidentially to persons who employed A as a solicitor, conveying charges injurious to his professional character in the management of certain concerns which they had entrusted to him, and in which the writer of the letter was also interested. 2. Anything said or written by a master in giving the character of a servant who has been in his employment. 3. Words used in the course of a legal or judicial proceeding, however hard they may bear upon the party of whom they are used. 4. Publications duly made in the ordinary mode of parliamentary proceedings. These are the acknowledged exceptions to the general rule. But the term “exceptions,” as applied to cases like these just enumerated, could never be interpreted to mean that there is a class of actors in transactions placed above the cognizance of the law, absolved from the commands of justice. It is difficult to conceive how in society, where rights and duties are relative and mutual, there can be tolerated those who are privileged to do injury legibus soluti; and still more difficult to imagine how such a privilege could be instituted or tolerated upon the principles of social good. The privilege spoken of in the books should, in our opinion, be taken with strong and well-defined qualifications. It properly signifies this, and nothing more: “That the excepted instances shall so far change the ordinary rule, with respect to slanderous or libelous matter, as to remove the regular and usual presumption of malice, and to make it incumbent on the party complaining to show malice, either by the construction of the spoken or written matter, or by facts and circumstances connected with that matter, or in the situation of the parties adequate to authorize the conclusion. Baldwin, J. in White v. Nicholls, supra 266, 287. *In Cockaym v. Hodgkisson, 5 Car. & Pa. 543, we find it declared by Baron Parke, in a case of libel, which applies equally to a case of slander, “That every wilful and unauthorized publication, injurious to the character of another, is a libel; but where the writer is acting on any duty, legal or moral, towards the person to whom he writes, or is bound by his situation to protect the interests of such person, that which he writes under such circumstances is a privileged communication, unless the writer be actuated by malice. ’ ’
So in Wright v. Woodgate, 2 Cromp. Mees. & Rose. R. 573, it is said “A privileged communication means nothing more than that the occasion of making it rebuts the prima facie inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the onus of proving malice in fact, but not of proving it by extrinsic evidence only: he has still a right to require that the alleged libel itself shall be submitted to the jury, that they may judge whether there is evidence of malice on the face of it. ’ ’ This opinion is cited with approbation by the Supreme court of the United States in White v. Nichols, supra.
Even in the case most usually cited in the books as a case of privileged communication, that of a master giving the character of a servant, Lord Mansfield said, in Weatherstone v. Hawkins, 1 T. R. 110, that if express malice be shown, the master will not be excused; and the result of the authorities is that if the conduct of the defendant entirely consists of an answer to an enquiry, the absence of malice will be presumed, unless the plaintiff produces evidence of malice; but in the case of a master, if unasked and officiously, he gives a bad character to a servant, or if his answer be attended with circumstances from which malice may *be inferred it will be a question for the jury to determine, whether he acted bona fide or with malice.
Applying these well settled principles to the case before us, we must conclude, that the words charged and proven do not come within the exceptions to the general rule, known as confidential or privileged communications. If the slanderous words could be brought within either of the four exceptions laid down by the Supreme court of .the United States, they must be referred to the first exception above stated, to wit, “when the author of the alleged slander acted in the bona fide discharge of a public or private duty, legal or moral, or in the prosecution of his own rights or interests.”
If the slanderous words proven had been spoken to the witness Snead alone, who was the miller of the defendant, it might be argued with some plausibility, that they were spoken confidentially and bona fide, with a view to protect the defendant’s own interest, and therefore without malice. But there was certainly no “public or private duty, legal or moral, ’ ’ which impelled him to repeat the slander to Rowland and the Shropshires; nor can he justify himself that he was only protecting his own interests. There is nothing in the relation of landlord and tenants, which raises any presumption in his favor. These tenants were working their own horses and not the horses of the defendant. It was their own horses, and not the horses of the defendant, that these parties were guarding night after night, upon the information of the defendant that “Collins and his sons were horse thieves and would certainly steal them.” There is no evidence to show that these tenants of Dillard had in their possession any property whatever belonging to him. It cannot *therefore be said, that the author of the slander in this case “acted bona fide, in the prosecution of his own rights and interest. ’ ’ Indeed, all the cir *404 ■cumstances of the case, the situation and relation of the parties, the manner in which the communication was made, sometimes to one witness alone, and then publicly in the presence of all (if not of others present), repeated over and over ag-ain, imputing to the plaintiff not only a grave charge, which must destroy his reputation, but an infamous crime which the law punished at that time with death; all show that it was peculiarly a case where the law will imply malice and a wicked intent to injure. The law holds the aegis of its protection not only over the person and property of the citizen, but vigilantly guards, as equally sacred, his personal reputation and character. And the man who assails the character of his fellow man, and would secure himself from responsibility upon the ground that what he has spoken or written was only done confidentially and with no intent to injure, and without malice, must be careful that what he has said or written comes within the well defined qualifications which the law attaches to confidential or privileged communications. In the case before us the slanderous words charged and proved do not come within that category.
Having disposed of the main question in the case, and concluding that the alleged slander does not fall within the class known as privileged or confidential communications, it follows that the court did not err in refusing to allow the defendant to answer the questions as set forth in the third bill of exceptions. The defendant was put upon the stand, and a number of questions put in various forms as to his feelings and motives in making the charge, whether with any ill will ^against the plaintiff, or only for the protection of his own rights and interests.
The court did not err in rejecting these questions and answers. What boots it, that a man may come forward after he is sued for damages for slander and say that what he said was not maliciously said. What have his feelings and motives to do with the controversy? Can a man who has charged another with a crime, punishable with death, come forward and say, “I made this charge, but I had no unkind feelings against the plaintiff: I was not actuated by-malice. ” To allow this mode of proof, would be to say that while the law imputes malice to the party who utters words actionable in themselves, he may absolve himself from the commands of justice if he will say at the trial that he had no unkind feelings against the plaintiff, and that what he said was not said maliciously, but only confidentially, with a view to protect his own interests. The law will not tolerate such a subterfuge, and the court below was right in rejecting such evidence. It was held by this court in McAlexander v. Hume, 6 Munf. 465, that proof of declarations by the defendant, after the institution of suit for slander, that he did not mean to charge the plaintiff with the. crime alleged by the slanderous words, or that words were spoken in heat of passion, are inadmissible. The fact that the defendant is a competent witness under the statute does not change the rule of evidence.
Another objection made by the appellant is, that the court refused to strike out from the deposition the following question and answer of the witness Rowland.
The 5th question objected to is in these words:—
“5th question by same. Did you become acquainted *with the general character of Zachariah Collins for honesty? If so, state what it was and is..” To which the witness answered:
“Answer. As far as I could see I didn’t see anything against the man. I never heard anything against him by any man except by Mr. Dillard.”
It is noted in the deposition that “the defendant by his counsel excepts to the above answer.” The only objection to this answer as legal evidence is, that the witness does not state in reply to that question, that he is acquainted with the general character of the plaintiff. But the defendant, as he ought to have done, does not state the ground of his objection. If he had, the objection would have been at once removed; for in the cross-examination the witness in reply to the -question, “You don’t know what the plaintiff’s neighbors think of his character as an honest man do you?” says “I don’t know what all of them thought. I talked with a number: they all spoke favorably of his character. ’ ’ If the evidence of the witness had been confined to the part of the answer objected to, it ought to have been excluded, for a witness cannot give his own opinion of the character of the plaintiff. But when the witness knows the general character of the party of whom he is speaking, and proves it to be good among his neighbors, and adds to this statement, “that as far as he could see he did not see anything wrong in the man,” a court will certainly not reverse the judgment because these latter words were not stricken out. The court, looking to the whole deposition, saw that the witness knew the general character of the plaintiff, and could therefore speak of it intelligently. It is not sufficient that a party objecting (in a deposition) should simply record his objection to an answer of the witness, but he must put his finger on *the point of objec tion, so that the other party may supply the deficiency, if any; otherwise it takes the other party by surprise at the trial. But, in this case, the court looking to the whole deposition, and seeing that the witness was well acquainted with, and proved in cross-examination his knowledge of the general character of the plaintiff, did not err in refusing to strike out the answer in the examination in chief.
As to the remaining questions and answers referred to in the second bill of exceptions, it is sufficient to remark that these were not objected to at the time the depositions were taken. Not being objected to then, it was too late to move to exclude them at the trial.
*405 As to the fourth bill of exceptions, no proper g-round of error is stated. The defendant introduced a witness to whom he asked the question whether he had or had not heard of threats from the sons of the plaintiff, made since the commencement of this trial, against witnesses of the defendant who had testified or should testify against the character of the plaintiff and his sons. The court properly excluded this evidence. It was not pertinent or relevant, and could not, in any manner, affect the issues which the jury were sworn to try— those issues being not guilty and justification.
The fifth and sixth bills of exception state as ground of error, the refusal of the court to permit the defendant to propound the following questions to a witness introduced by him: 1st. What was the habit of the neighbors of the plaintiff in reference to social infercottrse with him; and to what catise was that habit due? 2d. Was or was not the reputation of the plaintiff such as to affect social intercourse between him and his neighbors? If so, to what extent and how did it affect such intercourse? These questions *were properly rejected by the court. It is true that it has been settled by this court that a defendant in an action of slander may, in mitigation of damages, when the pleas are not guilty and justification, offer evidence of the general bad character of the plaintiff with regard to the specific matter with which he is charged. But the enquiry as to his general bad character must be limited to that specific matter. It would certainly have been competent in this case, for the defendant to have offered evidence to prove the general bad character of the plaintiff for honesty, but all enquiries as to “the habits of his neighbors with reference to social intercourse with him,” and the cause of that want of social intercourse, or whether “his reputation was such as to affect social intercourse between him and his neighbors, ’ ’ were properly rejected. The inquiry must be limited to his general bad character for honesty, the charge being that he was a thief.
There remains lo be noticed the seventh and eighth bills of exceptions, which may be disposed of in a few words. The questions ruled out by the court below, which form the ground of these exceptions, were enquiries as to common rumors connecting the plaintiff with hog-stealing, and as to the conviction of the plaintiffs and his sons with stealing a cow from the witness. Both of these questions were properly rejected by the court. Under the pleading in the cause these were not proper subjects of en-quiry. The charge was, that the plaintiff was a horse-thief. It would have been no answer, under the plea of justification, to show that the plaintiff had stolen a hog or a cow, much less would it be competent to prove common rumors in the neighborhood that he had been guilty of either of these crimes.
*Upon the whole case, the court is of opinion, for the reason herein stated, that there is no no error in the judgment of the Circuit court of Albemarle, and that the same should be affirmed.
Judgment affirmed.
BANKRUPTCY AND INSOLVENCY.
I. Definitions.
II. General Principles.
III. Jurisdiction and Procedure.
IV. Discharge and Its Effect.
V. Powers and Duties of Assignee.
VI. Articles in Virginia Law Register.
I. DEFINITIONS.
Bankrupt. — The term “bankrupt” originally meant a trader who secreted himself or did certain other acts tending to defraud his creditors. It was distinguishable from “insolvent” in that a bankrupt must have been a trader, and the object of the proceedings against, not by, him. This distinction was preserved by the English bankruptcy acts until recent times, when it was practically abolished. In the United States the distinction is not generally regarded, and it seems to be settled that the word is used in the constitution of the United States, not in the early English sense, but as commensurate with “insolvent.” As used in the bankruptcy acts, “bankrupt” means a person who has done or suffered to be done some act which is by law declared to be an act of bankruptcy. Bl. Com. 471; 2 Kent Com. 389: Bouv. Law Dict.. “Bankrupt”; Burr.. Law Diet., “Bankrupt.”
Insolvency.
Technical Definition. — As used in the insolvency and bankrupt laws, especially when applied to traders or persons engaged in commercial pursuits, the term “insolvency” generally means the condition of a person who is unable to pay his debts as they become due in the ordinary course of business. 1ft Am. & Eng. Enc. Law 636.
General Definition. — In McArthur v. Chase et als., 13 Gratt. 683, it was held that, in the act of March 29, 1837, Sess. Acts 188677, p. 41, relating to limited partnerships, the word “insolvency,” in § 20 of said act, means that the partnership has not sufficient property and effects to pay all its debts.
II. GENERAL PRINCIPLES.
What Amounts to an Act of Bankruptcy. — A general assignment for the benefit of creditors is an act of bankruptcy, whether the grantor be solvent or insolvent. Lea Brothers & Co. v. West Co., 4 Va. Law Reg. 662.
Fiduciary Debts. — J, the surety ot'M, who was the guardian of R, paid R $4,000 of the indebtedness due from M to R, as guardian. J. dies and his administrators sue M in assumpsit for the amount so paid, and M pleads his discharge in bankruptcy in bar to the recovery. The administrators of J reply that the debt due by M to their intestate is a fiduciary debt from which he is not discharged under section 32 of the bankrupt act. Held, the debt due by M to the estate of J is not a fiduciary debt, and his discharge in bankruptcy is a bar to the recovery of the same. The debt due by M to J's estate was a simple contract debt, provable under the bankrupt act and discharged by it. Cromer v. Cromer, 29 Gratt. 280.
Conclusiveness of Bankruptcy Proceedings, —A creditor by judgment of a bankrupt, who proves his *406 debt in the bankruptcy proceedings, and takes an active part in these proceedings, cannot afterwards go into a state court to subject property sold by the assignee of the bankrupt, and the proceeds distributed in that proceeding, to satisfy his judgment, on any ground of error which might have been corrected in the bankrupt court, or by appeal from the order or decree of that court, Spilman v. Johnson, 27 Gratt. 33.
Salary of Public Officers. — In Blair v. Marye, 80 Va. 485, it was held that the salary of the attorney general being of constitutional grant, and of public oficial right, is not liable to assignment in'bankruptcy.
As against the State, — The state is not subject to the provisions of the bankrupt laws, and the discharge of a bankrupt does not dicharge him from his liabilities to the state. Saunders v. Commonwealth, 10 Gratt. 496.
Public Officers, — In Saunders v. Commonwealth, 10 Gratt. 494, it was held that the sureties of a public officer are not excluded from the benefit of the bankrupt act of 1841.
Prior Attachment. — The twenty-first section of the bankrupt act, of 1867, so far as the stay is concerned, applies to personal final judgments against the debtor, and not to judgments against property attached, or the proceeds of the sale thereof, when the attachment lien accrued prior to the filing of the petition in bankruptcy. An attachment lien, acquired regularly, without the procurement or sufferance of an insolvent debtor, to give preference to the attaching creditor over other creditors, will not be displaced by virtue of the thirty-fifth or thirty-ninth sections, by subsequent proceedings in bankruptcy, though commenced within four months after the levy of the attachment. Under said sections something more than passive non-resistance in an insolvent debtor is necessary to invalidate an attachment lien on his property, when the debtis due and he has no defence. In such case there is no legal obligation on the debtor to file a petition in bankruptcy to prevent the attachment and levy thereof, and a failure to do so is not sufficient evidence of an intent to give a preference to the attaching creditor or to defeat the operation of the bankrupt law. Though the attaching creditor, in such case, may know the insolvent condition of the debtor, his attachment and levy upon his property are not, therefore, void and are no violation of the bankrupt law. Mason v. Warthens, 7 W. Va. 532.
Secured Claims. — A judgment creditor of a bankrupt whose judgment is a lien upon any estate bona'Me sold and conveyed by the bankrupt, before the bankruptcy, may claim and secure in the proceeding in bankruptcy, his portion of the estate of the bankrupt, in virtue of his said judgment, without accounting or giving credit for anything on account of the lien of his j udgment'upon the estate so sold and conveyed. And though such creditor may have so claimed and received in the proceeding in bankruptcy, his portion of the estate of the bankrupt, such judgment creditor may, by a suit in equity, enforce the lien of his said judgment upon the estate bona Me sold and conveyed before the act of bankruptcy, for the recovery of any balance of said judgment which may remain unsecured in .the proceeding in bankruptcy; and that, though he may not, in the said proceeding, have asserted or given any notice of the lien of his said judgment upon the estate so sold and conveyed. McAden v. Keen, 30 Gratt. 400.
Debt Secured on Property of Third Person. — Only the estate of a bankrupt, whatever it may be, at the time of his becoming such, including any estate he may have aliened by an act fraudulent and void as to his creditors, is vested in his assignee in bankruptcy for the benefit of his creditors. And, therefore, no estate which may have been sold by him to a bona Me purchaser for valuable consideration fully paid prior to the act of bankruptcy, becomes so vested in said assignee. McAden v. Keen, 30 Gratt. 400.
Bankruptcy of Agent. — Y agrees with D to assign to D a bond held by Y, to indemnify D for becoming his surety; but the bond not being present, is not then delivered to D. Afterwards Y commits an act of bankruptcy, upon which he is' duly declared a bankrupt. After committing the act of bankruptcy, Y writes upon the bond an assignment of it to, D, and delivers it to D, who collects the money from the obligor. Held, D is entitled to hold the money as against the general assignee of the bankrupt. Tucker v. Daly, 7 Gratt. 330.
Bankrupt Partnerships. — when partners as such are declared bankrupt, their property, both partnership and individual, is to be administered under section 36 of the bankrupt act of 1867, in the bankrupt court; and every creditor, whether individual or social, must prosecute his claim in that court. Lindsey v. Corkery, 29 Gratt. 650.
Bankrupt Partners. — Where a partnership is dissolved, and the individual partners are declared bankrupts in different bankrupt courts, in different states, each with his own assignee, and in their schedules make no mention of partnership debts due to them or by them, a creditor of the partnership may proceed in a state court to subject the partnership effects to the payment of the partnership debts. Lindsey v. Corkery, 29 Gratt. 650.
Homestead. — Where defendant, before going into voluntary bankruptcy, has made a deed of settlement upon his wife for certain real estate, which was afterwards set aside as fraudulent, he can then, being a householder and head of a family, claim his homestead exemption in the property embraced in the deed; and the fact that he has made such claim in the bankrupt proceedings, in which only a small part of .the exemption was'then setoff to him, does not preclude him from claiming the residue. Hatcher v. Crew’s Adm’r, 83 Va. 371, 5 S. E. Rep. 221.
Sale by Sheriff. — When a debtor takes the insolvent oath, and delivers in a schedule, the sheriff is vested, by the act of assembly, with all the insolvent’s estate, rights and interests, whether they are named in the schedule, or not, and whether the property be in the possession of the debtor, or in that of ans other person. The sheriff has the right to sell, and to pass by deed, a slave, or other chattel, which the insolvent debtor has made a fraudulent gift of to his child (but of which he retains the possession), and the purchaser under such sale may recover the slave, or other chattel, although the sheriff had not possession of it, at any time. But if the property so fraudulently given, be not' in the possession of the insolvent debtor, but of some other person,, although the title vests in the sheriff, it seems that he cannot sell the property in such case, but must proceed by summons against the person holding it. However, even if the spirit of the act were violated by selling the chattels of the insolvent, before they come into possession of the sheriff, yet as the legal title is vested in him, if he does sell, the sale is not void, and the purchaser may recover. *407 The sheriff is a trustee for the creditors, and for a violation of Ms trust, he may "be responsible but that does not prevent the legal title from passing' to : the purchaser. Shirley v. Long, 6 Rand. 735.
In Taylor v. Mallory, 96 Va. 19, 30 S. E. Rep. 472, it was held that, under the insolvent debtor's act in force in 1838, all property owned by the debtor at the time he took the oath of insolvency, whether mentioned in his schedule or not. and whether fraudulently conveyed or still retained by him, vested in the sheriff. But the evidence in the casé at bar does not show that the sheriff ever set up any claim to the land in controversy, or that he ever sold or conveyed one foot of it, and the instruction objected to does nottell the jury what property vested in the sheriff under the insolvent debtor’s oath, but only what the sheriff conveyed to the party under whom the defendants claim title.
III. JURISDICTION AND PROCEDURE.
Jurisdiction-Federal Courts. — -The administration of the effects of a bankrupt rests exclusively in the federal courts; and where, before adjudication, a state court has taken jurisdiction to administer the assets transferred under a general deed of assignment, the parties will be enjoined from further proceeding in the state court, and plenary jurisdiction will be assumed by the district court of the United States. Lea Brothers & Co. v. West Co., 4 Va. Law Reg. 662.
State Courts. — Where there has been a judicial sale and confirmation in the 'state court to enforce a judgment lien, and after the sale the defendant is declared a bankrupt, and without taking any step in the state court he applies to the United States district court and there obtains a decree setting aside the sale, which decree was reversed by the United States circuit court and the assignee in bankruptcy directed to proceed in the state court for relief, it was held: (1) thestate court havingpossession of the case and having made a decree therein before the bankruptcy of the defendant, he or his assignee can proceed only in that court to maintain their rights; (2) the assignee knowing the proceedings in thestate court, and not having made himself a party in that court, and it not appearing that such court even knewof the bankruptcy of the defendant, the decree of the court confirming the sale was valid, even in the absence of the assignee: (3) the purchase being bona fide and being confirmed by the court, the onus is on the bankrupt or his assignee if he would set the sale aside, to show the inadequacy of price, or that only a portion of the land should have been sold to pay the plaintiff's debt, and this they failed to do; hence the assignee is entitled only to what the bankrupt would have been entitled if he had not been declared a bankrupt, i. e., the surplus of the purchase money after satisfying the plaintiff’s judgment and cost of the suit. Barr, Assignee, v. White et als., 30 Gratt. 531.
Proceedings in State Court — Finality.—Where a state court in attachment proceedings has legally and properly taken hold of the property of an insolvent and, divided the proceeds thereof among all of the creditors, equally and ratably, all but two of them consenting and releasing the debtor, all of which was consummated before the involuntary feature of the bankrupt act went into effect, the dissenting creditors cannot, by proceedings in bankruptcy, have annulled the action of the state court. Botts v. Hammond, 5 Va. Law Reg. 789.
Effect of Bankruptcy Proceedings in Suit Pending in State Court. — Subsequent proceedings in bankruptcy, to which a lien creditor is not made a party, do not divest the state court of jurisdiction of a suit pending therein for the enforcement of his lien, the rule being that the court that first takes jurisdiction of the parties and the subject-matter retains it. Francisco v. Shelton, 85 Va. 779, 8 S. E. Rep. 789.
A creditor of a bankrupt having a lien on his real estate, has two courses open to him, either of which he may adopt. He may decline to appear in the bankrupt court; and he will be unaffected by any proceeding in that court; unless, indeed, the proper steps are taken to sell the estate clear of all incum-brances; or he may elect to proceed in the bankrupt court, prove his debt there, and rely upon his security. If the creditor elects to proceed in the bankrupt court, this is a waiver of his right to insti - tute any suit or proceeding at law or in equity, which is in anyway inconsistent with his election to obtain satisfaction of his debt under the bankruptcy proceedings. Spilman v. Johnson, 27 Gratt 33.
Parties to Suit. — in a suit by judgment creditors to subject their debtor's land to the payment of their debts, pending the cause the debtor is declared a bankrupt, and he applies for a homestead under the constitution and law of Virginia and the acts of bankruptcy of the United States. Held, that the assignee in bankruptcy of the defendant debtor should be made a party to the suit. Barger v. Buckland, 28 Gratt. 852.
In Abernathy v. Phillips, 82 Va. 769, 1 S. E. Rep. 113, it was held that a bankrupt cannot appear as a party plaintiff in a suit, except as by his assignee.
In a creditor’s suit the defendant debtor becomes a bankrupt pendente lite. His assignee is not made a party, but is counsel in the cause, and one of the commissioners to sell the land. It is no objection to a sale that he had not been made a party to the suit. Bank v. Campbell, 75 Va. 455.
Where land is sold under proceedings in bankruptcy, persons interested in the land, but not parties, are not bound by the sale, though the bankrupt was the administrator of the estate through which they claim. Moorman v. Arthur, 90 Va. 455, 18 S. E. Rep. 869.
Averment of Appointment of Assignee. — Whether sound law or not that “a suit to set aside fraudulent deed made by bankrupt before his bankruptcy can only be maintained by his assignee,'5 there must be an averment that there was such assignee duly appointed and qualified before the matter will be considered. Elder’s Ex’ors v. Harris, 76 Va. 187.
Authority of United States Supreme Court Decisions in State Courts. — Queere: Have the decisions of the supreme court of the United States application to judgments of state courts prior to the adjudication in bankruptcy, the liens whereof have not been affected by the proceedings of the bankrupt court? Ferrell v. Madigan, 76 Va. 195.
Assignee Appointed in Another State. — In Cannon v. Wellford, 22 Gratt. 195, bankruptcy proceedings had been instituted in New York, and an assignee appointed by the court of that state. Held, the New York court having first taken cognizance of the matter as to both partners, acquired complete and exclusive jurisdiction of the whole case; the assignee appointed by that court was the regular and legal assignee of both partners; and it was not competent to the Virginia tribunal, by subsequent proceedings, to oust that jurisdiction, and appoint other and different assignees. The fact that there *408 were assets in different districts, and different states, does not, in any degree, affect the rights of the assignee. He represents 'the "bankrupt and their estate in every state, and collects the assets wherever found.
Conflict of Laws. — In Devisme v. Martin, Wythe 133, it was held that, if a British subí ect be declared a bankrupt in England, having debts due him in this commonwealth, his British creditors cannot recover satisfaction out of said debts in our courts; for the English law will govern in our courts in such a case and by that law said debts would be transferred to the assignees in bankruptcy.
Remedy for Wrongful Discharge. — The acts of courts of competent jurisdiction, having cognizance of the parties and the subj ect-matter, cannot be questioned elsewhere. If bankrupt court wrongfully allows the bankrupt the exemption claimed by him, the remedy is not in the state courts. Brengle v. Richardson, 78 Va. 406.
Prosecution of Pending Actions, — An action is not abated by the bankruptcy of the plaintiff, but it can no longer be prosecuted in his own name, for the right to prosecute such action belongs exclusively to the assignee or trustee in bankruptcy, and must be in the name of the latter. Cannon v. Wellford, 22 Gratt. 195.
Powers of Bankrupt Court. — The bankrupt court controls the property of the bankrupt, and though such property be encumbered by liens, it may bring the lien-holders into court, sell the property free of liens, and distribute the proceeds according to priorities. Blair et als. v. Carter’s Adm’r et als., 78 Va. 631.
IV. DISCHARGE AND ITS EFFECT.
Effect on After-flatured Judgments,— Judgments matured against a bankrupt after his adjudication on pre-existing provable debts, are not liens on his after-acquired lands; but the bankrupt is released by his discharge from them, as well as from the debts whereon they are founded. Blair et als. v. Carter’s Adm’r et als., 78 Va. 631.
Provable Debts. — In Blair et als. v. Carter’s Adm’r et als., 78 Va. 621, it was held that, under statute (U. S. Rev. Stat. sec. 5106), no suit on, the provable debt can be prosecuted to judgment, against a bankrupt, until the question of his discharge is determined; but by leave of the bankrupt court the suit may proceed to ascertain the amount which ought to be proved therein.
By maturing a pre-existing provable debt of the bankrupt into a judgment, the form and remedy are changed, but the debt remains the same and is provable in bankruptcy. Accordingly by U. S. Rev. Stat. sec. 5119, the bankrupt is released from such judgment by his discharge, and the debt is not merged in the judgment. Blair et als. v. Carter’s Adm’r et als., 78 Va. 621.
Effect on Prior Judgments — Liens.—All interest on property held by a bankrupt, and all property which he .has fraudulently conveyed, comes within the jurisdiction of the bankrupt court. But that court has no jurisdiction over property bona fide conveyed to a purchaser by the bankrupt before he is declared a bankrupt. And a creditor by judgment docketed against the bankrupt recovered before a bona fide conveyance of land, may proceed in a state court to enforce his judgment lien against said land. Parker v. Dillard, 75 Va. 418.
A judgment of state court, regularly docketed, before debtor was adjudicated a bankrupt, was assigned to a third person, who had no notice of the proceedings in the bankrupt court, made no claim and received nothing from the bankrupt’s funds there administered. Judgment debtor afterwards sold to purchaser, for value, land owned by him at time of his bankruptcy. On bill filed in state court for benefit of assignee of the judgment against judgment debtor, his assignee in bankruptcy, and the purchaser, to subject the land to pay the judgment, helot, the judgment having been obtained before the bankruptcy, the state court has j urisdiction to enforce its lien on the land in possession of the alienee of the bankrupt; and conceding that the bill should have been filed in the name of the assignee in bankruptcy, yet he, being a defendant, made no objection to the jurisdiction. Had the point been made at proper time the difficulty would have been removed. It is too late to raise the objection for the first time here in argument. Ferrell v. Madigan, 76 Va. 195.
The lien of a judgment is not defeated by-the discharge of the debtor as a bankrupt. And it may be enforced in the state courts. In such case the eleait sued out upon the judgment may be in the usual form; and in executing it the sheriff must take notice of the bankruptcy of the debtor, and disregarding all property of the debtor not subject to the lien, levy it upon that which is so subject. McCance v. Taylor, 10 Gratt. 580.
A judgment debtor having obtained his discharge as a bankrupt subsequent to the judgment, may enjoin the suing out or levy of any execution upon said judgment. Peatross v. M’Laughlin, 6 Gratt. 64.
Liability of Homestead after Discharge. — Judgments obtained and docketed, and liens acquired before the debtor is adjudicated a bankrupt, may, after he is discharged as such, be enforced in the state courts at the instance of persons who were not parties to the bankrupt proceedings, on lands owned by him before his adjudication and allotted him for his homestead. But the decree of the state court for sale of the land does not impinge the decree of the bankrupt court allotting the land to the bankrupt for his homestead, because the judgment lienors were not parties to the proceedings wherein the latter decree was rendered. McAllister v. Bodkin, 76 Va. 809.
Liability of Surety of Bankrupt. — Parties having obtained decrees against their debtor in a suit pending in the county court, and he having become bankrupt, may bring another suit in the circuit court against the administrator and heirs .of a surety of the bankrupt to subject the real estate of the surety to satisfy their debts. Ewing v. Ferguson, 33 Gratt. 548.
In Appellate Court. — where, after the reversal of the judgment appealed from, appellees haye been declared bankrupt, and obtained their discharge, the appellate court will, in their judgment of reversal, see that execution shall not issue upon the judgment without a previous order to take effect by the court below after due notice. Exchange Bank v. Knox, 19 Gratt. 739.
Ex-.Territorial Effect of Discharge. — G., a citizen of Maryland, gave his bond, in Virginia, to B„ a citizen of Virginia, and, afterwards, in Maryland, became a bankrupt, by the laws of Maryland. Under which he was duly discharged, by the competent tribunal of Maryland, under a general direction, with respect to his creditors. This did not discharge him, in a suit afterwards brought upon the bond, in Virginia. Banks v. Greenleaf, 6 Call 271.
Since, under Acts 1877, c. 114, 1, non-residents are *409 not entitled to "homestead exemption, a resident of Virginia declared a "bankrupt by a United States district court sitting- in that state was not entitled to homestead in land situated in West Virginia, in a suit by his creditors there, though the land had been so set apart by his assignee in Virginia, and confirmed by the bankrupt court there. Gibbs v. Logan, 22 W. Va. 208. See especially, monographic note on “Homestead" appended to Hatorff v. Wellford, 27 Gratt. 356.
When Assignment Takes Effect. — The assignment of bankrupt effects relates back to the commencement of proceedings in bankruptcy: therefore, by operation of law, all attachments on mesne process, of the property of the debtor, made within four months next preceding the commencement of the proceedings, are dissolved. Weisenfeld v. Mispelhorn, 5 W. Va. 46.
Conclusiveness of Discharge. — A decree discharging a bankrupt from his debts under the act of congress of August 19th, 1841, is conclusive upon all his creditors in all suits which may be*brought against him in any court, except where the discharge is impeached for some fraud or willful concealment by the bankrupt of his property or rights of property, contrary to the provisions of that act. Tichenor v. Allen, 13 Gratt. 15.
Fraud of Bankrupt — in Jones' Ex’ors v. Clark et als., 25 Gratt. 642, a person had purchased from an executor bonds given to the executor for the purchase price of land sold by him in his representative capacity, at a discount of eighteen per cent. Held, the purchaser was guilty of constructive fraud in purchasing the bonds at so large a discount and was liable for the amount of the bonds: that the purchaser having pleaded that he was a discharged bankrupt, it was held that section 33 of the bankrupt act of 1867, which provides “that no debt by the fraud.5' etc., of the bankrupt “shall be discharged under this act, applies as well to implied as to actual fraud, and the purchaser was not discharged from the payment of this debt.
A creditor of a discharged bankrupt who has not proved his debt in the proceeding in bankruptcy, may under the statute, Code, ch. 179, § 2, p. 677, file his bill to set aside a fraudulent conveyance made by the bankrupt and impeach his discharge on the ground of fraud or a willful concealment of his property, without having first recovered, a judgment against the bankrupt. Tichenor v. Allen, 13 Gratt. 15.
Creditors who have not proved their debts in the proceeding in bankruptcy, may institute suits to set aside fraudulent conveyances made by their debtor before he petitioned for the benefit of the bankrupt law; and may impeach his discharge in bankruptcy on the ground of fraud or the willful concealment of his property or rights of property contrary to the provisions of the act of congress: such suits being instituted more than two years after the decree of discharge in bankruptcy. Such suits may be instituted in any court, state or federal, in which, independent of the bankrupt act, a suit may be properly brought against the bankrupt. Tichenor v. Allen, 13 Gratt. 15.
Assignment of Debts Due from Bankrupt.™A debtor of an insolvent bank purchasing debts due from such bank after a decree for an account rendered under a bill against the bank by the stockholders, is only entitled to stand in the shoes of his assignor, and receive his proportion of the assets realized. Finney v. Bennett, 27 Gratt. 365.
Effect of Dischargeupon Vendee’s Title. — The vendee of a bankrupt may defend his own title by defending that of his vendor, which can be done by setting up the latter’s discharge in bankruptcy, and his release from the debt claimed. Blair et als. v. Carter’s Adm’r et als., 78 Va. 621.
New Promise to Pay after Discharge. — A verbal promise to pay an old debt, will be sufficient to bind one discharged in bankruptcy, if it be of such a character (not casual or implied, but so express and unequivocal) as to show that the promisor intended deliberately to waive the protection of his discharge in bankruptcy, and to re-bind himself legally to pay the old debt: but amere acknowledgment of the justice of the debt, of the moral obligation to pay it, and an expression of purpose to pay it at some future time, or when able, will not have the effect, in the absence of a deliberate intention thereby to bind himself. A moral obligation to pay a debt is never stale, and may be the consideration for a new promise to pay an old debt, at any distance of time after the discharge of the debt by bankruptcy. Horner v. Speed, 2 Pat. & H. 617.
Limiting Suit on New Promise. — When a debt is discharged in bankruptcy within five years after it is incurred, and a suit is brought on a new promise to pay it, within five years after the new promise— a plea, that five years have elapsed since the original cause of action, or since the discharge in bankruptcy, is bad, and should be rejected. Horner v. Speed, 2 Pat. & H. 617.
V. POWERS AND DUTIES OF ASSIGNEES.
It is held that under the bankrupt acts the rights of action which are transferred to the assignee do not include claims for personal damages. The rights of action which are transferred to the assignee are rights of action founded on beneficial contracts made with bankrupt, where the pecuniary loss is the substantial and primary cause of action, and for injuries affecting his property so far as they do not involve a claim for personal damages. .Tn many respects the assignee in bankruptcy stands in the same relation towards the bankrupt’s estate as that of an executor towards the estate of his testator. Hence the proper and reasonable construction seems to be that the statute as to bankruptcy transfers such rights of action as would be assets in the hands of the executor for the payment of debts, and no others. Dillard v. Collins. 25 Gratt. 343.
Powers of Assignee. — An assignee in bankruptcy has no power to sell the land of his bankrupt free of liens, without a special order of court; a district court alone has jurisdiction to make such order, and then only after the lien creditors have been served or affected with notice to appear and show cause against it. Boulware v. Hartsook’s Adm’r et als., 83 Va. 679, 3 S. E. Rep. 289.
An assignee or trustee in bankruptcy not only represents the bankrupt, but the creditors as well, and may pursue any remedy that may be necessary to protect the interest of the latter, and therefore he may contest claims and rights which the bankrupt himself could not contest. Cannon v. Wellford, 22 Gratt. 195.
Homestead of Bankrupt. — M was adjudged a bankrupt and discharged in 1873. He claimed as his homestead certain land, which the bankrupt court allotted him, but without notice to his creditors, who were lienors by judgments recovered in 1857. Those creditors in 1878 filed their bill in the state *410 court to enforce their liens on said land, hut did ■not make T, who was the assignee in bankruptcy of M, a party. M demurred, answered, and pleaded that the enforcement of the judgments was barred by the lapse of twenty years between their date and the filing of the bill. The demurrer was overruled and decree of sale entered, but the commissioner of sale was not directed to give the usual bond. On appeal by M, held, under the bankrupt laws of the United States, the legal title to the bankrupt’s homestead does not vest in his assignee; and if it does vest, eo instante the homestead is allotted him, the legal title thereto reverts to him. Therefore the assignee had no interest in the subj ect of this suit and was not a necessary party.
The assignee had not even a reversionary interest in the subject of this suit, as by Code 1873, p. 1171, ch. 183, § 8, if the homestead be not aliened in the householder’s lifetime, after his death it continues for benefit of his widow and children, until her death or marriage, and after her death or marriage until the youngest child becomes twenty-one years of age; after which it passes to his heirs or to his devisees, not subject to dower, but subject to all his debts. In no event does it pass to his assignee in bankruptcy. McAllister v. Bodkin, 76 Va. 809.
Property Held in Trust for Debtor, — An assignee in bankruptcy may assert his right to the proceeds of his bankrupt’s trust property sold by a trustee, in a suit wherein the ownership of said proceeds is litigated. Smith v. Profitt, 82 Va. 833,1 S. E. Rep. 67.
Limitation of Actions by or against Assignees. — In Cobbs v. Gilchrist, 80 Va. 503, it was held that, U. S. Revised Statutes, section 5057, limiting action by or against assignees to two years after accrual of rights, applies to all litigation between him and any adverse claimant.
The assignee’s claim is barred by lapse of two years from maturity of his claim, and not from date of assignment. Smith v. Proffit, 82 Va. 833, 1 S. E. Rep. 67.
The limitation of two years after the, decree in bankruptcy or after the cause of suit shall first have accrued, provided in § 8 of the bankrupt act, has relation to proceedings by or against the assignee in bankruptcy; and does not apply to suits by creditors who have not proved their debts to set aside fraudulent conveyances by the bankrupt. The only effect of this provision on such creditors is to prevent such a suit until the two years have expired. Tichenor v. Allen, 13 Gratt. 15.
VI. ARTICLES IN VIRGINIA LAW REGISTER.
Numerous interesting .questions on the law of bankruptcy may be found discussed in the Virginia Law Register. See, 5 Va. Law Reg. 365; 4 Va. Law Reg. 440; 4 Va. Law Reg. 818; 4 Va. Law Reg. 402 ; 4 Va. Law Reg. 554; 4 Va. Law Reg. 268.